IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33794-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEREMIAH JAMES GILBERT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Jeremiah Gilbert appeals from the resentencing accorded him under the *Miller* fix,[1] RCW 10.95.035. Since the trial court complied with the dictates of the statute, we affirm.

FACTS

At age 15, Mr. Gilbert murdered two men and attempted to murder a third. The crimes occurred after he and a young companion had run away from their homes in Buckley and journeyed on foot to the area of Goldendale in Klickitat County. Chancing upon a Ford Bronco belonging to Farrell Harris, who was hunting in a nearby canyon, the two broke into the vehicle and attempted to steal it.

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

Harris returned from the woods and ran to halt the vehicle theft. Gilbert shouldered a rifle and fired at the man. Harris retreated to the woods and Gilbert kept shooting to keep him at bay. Harris ended up witnessing the ensuing killings.

Robert Gresham drove up on his motorcycle and stopped to see if there was a problem with the Bronco. Gilbert shot Mr. Gresham twice in the shoulder. He then walked up to the seriously wounded man, who was lying on the ground, and killed him with a shot to the head. Before the two youths managed to get the Bronco started, Mr. Loren Evans drove up in his truck. Mr. Harris saw Gilbert level his rifle and shoot. A single shot shattered the windshield and struck Mr. Evans in the head, instantly killing him.

The two young men then put their belongings in the truck, took Mr. Evans' body out, and drove off in the truck after first disabling the Bronco. Mr. Harris then came out of the woods and drove Mr. Gresham's motorcycle to alert authorities. The two young men were soon apprehended.

The juvenile court declined jurisdiction of Mr. Gilbert. The prosecutor then charged him in adult court with six offenses. A jury convicted him as charged. Included among the convictions was first degree murder of Mr. Gresham, first degree murder of Mr. Evans with aggravated circumstances, and second degree assault of Mr. Harris. The court sentenced Mr. Gilbert, as required, to a term of life in prison without possibility of parole for the aggravated murder conviction, and a consecutive term of 280 months for

the murder of Mr. Gresham. Because the murder of Mr. Gresham was required to be served consecutive to the life sentence for murdering Mr. Evans, it was scored with an offender score of zero and resulted in a standard range of 240 to 320 months. The other offenses, fully scored, were served concurrently to the first degree murder count.

Gilbert appealed to this court, which affirmed the convictions and judgment in an unpublished opinion noted at 83 Wn. App. 1039 (1996). After the release of *Miller*, Mr. Gilbert filed a personal restraint petition (PRP) in the Washington Supreme Court seeking resentencing. Upon the release of *In re Personal Restraint of McNeil*, 181 Wn.2d 582, 334 P.3d 548 (2014), the PRP was transferred to this court and assigned cause no. 32895-3-III. The parties then stipulated to dismissal of the PRP in order that Mr. Gilbert could be resentenced in accordance with the statutory response to the *Miller* decision. *See* Comm'r's Ruling (Wash. Ct. App. Mar. 4, 2015) (dismissing PRP).

The trial court conducted a resentencing hearing on September 21, 2015. Defense counsel presented an evaluation of Mr. Gilbert from Ronald Roesch, PhD, who had conducted a five hour interview of Mr. Gilbert in prison and opined that the murders were impulsive acts committed by an immature youth who now had finally matured. Defense counsel also argued that because the *Miller* fix resulted in an indeterminate sentence for

the aggravated murder conviction, the first degree murder count had to be resentenced

(with an offender score of 8) to run concurrently to the aggravated murder count.[2]

The trial court recognized Mr. Gilbert's progress in prison and voiced the belief

that he might soon be released on the indeterminate sentence because of his maturation.[3]

The court imposed a minimum term of 25 years and set the maximum sentence at life.

However, believing that concurrent sentences totaling 25 years was insufficient for the

multiple murders, the court directed that the aggravated murder conviction continue to

run consecutively to the first degree murder. The court rejected the defense position and

did not resentence on the other five counts.

Mr. Gilbert timely appealed to this court, which stayed the appeal pending the

outcome of *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017). After the release of

the opinion in *Ramos*, we directed the parties to file additional briefing addressing the

impact of that opinion, if any, on this case. After those briefs were received, a panel

considered the matter without argument.

---

[2] Mr. Gilbert himself told the court he would not ask for concurrent sentences, although he would ask the court to "realize that reform is possible if I choose it and I have chosen such." Report of Proceedings at 18.

[3] *See* WAC 381-40-150.

ANALYSIS

Mr. Gilbert contends that the trial court did not comply with the dictates of *Miller* when it imposed a consecutive sentence. Since the trial judge complied with the requirements of the *Miller* fix, Mr. Gilbert's argument essentially would require this court to overturn the statute. However, his argument already has been rejected by the Washington Supreme Court.

*Miller* forbids mandatory life sentences for crimes committed while a juvenile and directs that "'individualized consideration'" be given to those offenders, taking into account the differences between youths and adults "'and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *McNeil*, 181 Wn.2d at 588 (quoting *Miller*, 132 S. Ct. at 2469-2470). Thus, mandatory life sentences imposed for offenses committed prior to the offender's 18th birthday were unconstitutional under the Eighth Amendment.

In response, the legislature enacted RCW 10.95.030(3) to govern the sentencing of anyone who was to be sentenced in adult court for an aggravated first degree murder committed before their 18th birthday. The legislature also enacted RCW 10.95.035 to address the situation of those who previously had been sentenced to life in prison without the possibility of parole for crimes committed prior to their 18th birthday. That provision entitles each defendant to a resentencing in accordance with RCW 10.95.030. RCW 10.95.035(1). Under either circumstance, the trial court is required to impose an

5

indeterminate sentence that includes a minimum term of at least 25 years in prison and a maximum sentence of life in prison. RCW 10.95.030(3)(a)(i), (ii). For those who committed their crimes before age 16, the minimum term of 25 years is mandatory. RCW 10.95.030(3)(a)(i). For crimes committed between the offender's 16th and 18th birthday, the trial court is required to consider the diminished culpability of youth, in accordance with *Miller v. Alabama*, before imposing a minimum term. RCW 10.95.030(3)(b).[4] These statutes do not address other offenses sentenced under the Sentencing Reform Act of 1981, chapter 9.94A RCW.

Our court upheld the constitutionality of these *Miller* fix provisions in *McNeil.* There the defendants brought PRPs challenging their life sentences after *Miller* was issued. While the PRPs were pending, the legislature enacted its statutory response. 181 Wn.2d at 585-586. Denying a motion to dismiss the petitions, the court concluded that the statute created an entitlement to relief from pre-*Miller* sentences. *Id.* at 589-590. The *Miller* fix remedied the unlawfulness of the existing sentences, thus requiring that the

---

[4] It is for this reason that our dissenting colleague's discussion of *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017), is inapplicable to this action. *Bassett* involved an offender who was 16 and thus subject to a minimum term set by a judge under RCW 10.95.030(3)(a)(ii). This action involves subsection (3)(a)(i) and a mandatory minimum term of 25 years. Only the Indeterminate Sentence Review Board, not the trial court, is vested with the discretion to release Mr. Gilbert and others whose crimes were committed before their 16th birthday. RCW 10.95.030(3)(d)-(i).

PRPs be denied due to the existence of other remedies. *Id.* at 590. The court also rejected the claim that the *Miller* fix constituted an ex post facto violation. *Id.* at 590-593.

Here, the trial court did exactly what the statute required for someone such as Mr. Gilbert who committed aggravated murder before his 16th birthday—it set the minimum term at 25 years and the maximum sentence at life in prison. RCW 10.95.030(3)(a)(i). The statute does not *require* the reordering of other sentences from consecutive to concurrent. Indeed, it does not appear that reconsideration of the other sentences is even part of a *Miller* fix resentencing.[5]

Accordingly, we hold that the only issues presented by an appeal from a *Miller* fix resentencing are those related to the aggravated murder sentence(s) addressed by that statute. Thus, the ordering of sentences would normally not be at issue in an appeal unless there were multiple aggravated murders that were being resentenced. How a revised sentence is ordered with respect to other sentences that are not being reviewed by the trial court is not within the scope of the *Miller* fix since that issue was previously decided at the original sentencing and is not within the scope of the statutory fix.

---

[5] It is unclear to us if the trial judge believed the other sentences were even before the trial court since they were not expressly addressed.

However, that does not leave defendants facing a *Miller* fix resentencing without any remedy. Our Supreme Court recognizes that a *Miller* problem is presented when an offender faces a term of years that amounts to a de facto life sentence. *Ramos*, 187 Wn.2d at 437-440. The court also recently has recognized that *Miller* requires that all juvenile offenders sentenced in adult court must be able to seek exceptional sentences based on their immaturity at the time of the commission of the crime. *State v. Houston-Sconiers*, 188 Wn.2d 1, 18-21, 391 P.3d 409 (2017).[6] An offender is thus free to use that rationale to seek an exceptional sentence concerning the other counts or the ordering of the sentences in conjunction with a *Miller* fix resentencing.

With respect to Mr. Gilbert, whose resentencing occurred before the release of the *Houston-Sconiers* opinion and whose sentence will not be final until the mandate issues in this appeal, he is free to seek timely collateral relief by presenting a youthfulness mitigating factor argument. While he raised a related argument when seeking a concurrent sentence, he did not have *Houston-Sconiers* available to him and was unable to get the trial court to consider the other offenses at the resentencing. Thus, we conclude he did not already raise this claim.

---

[6] The dissent is unduly harsh on *Ramos* and fails to recognize that *Ramos* and *Houston-Sconiers* opened the door to mitigation of *all* youthful offenders still in prison serving lengthy sentences rather than simply those subject to *Miller v. Alabama*. The legislature also authorized reconsideration of lengthy sentences imposed on youthful offenders not subject to the *Miller* fix statute. *See* RCW 9.94A.730.

No. 33794-4-III
*State v. Gilbert*

Accordingly, the sentence is affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Korsmo, J.

I CONCUR:

_____
Siddoway, J.

9

No. 33794-4-III

FEARING, J. (dissenting) — What should the law do with an imprisoned man, who, at the age of fifteen, murdered two men and nearly murdered a third, who is now age forty-one and will not commit another crime if released? Should the law expiate the heinous crimes and satisfy the grieved by continuing to incarcerate the man indefinitely? The United States Supreme Court recently acknowledged social science and advances in neurological science when issuing landmark decisions under the cruel and unusual punishment clause concerning juvenile offender sentencing. A quartet of these decisions answers our question and compels me to dissent.

The majority affirms the trial court's resentencing of Jeremiah Gilbert on the basis that the trial court complied with the dictates of Washington's *Miller*-fix statute, RCW 10.95.030, a statute held unconstitutional by one of this court's sister divisions. *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017), *review granted*, 189 Wn.2d 1008, 402 P.3d 827 (2017). The majority's holding oversimplifies the issues in Gilbert's appeal. Whereas the trial court complied with the procedural dictates of the *Miller*-fix statute, the resentencing of Gilbert breached substantive rules of juvenile offender sentencing announced by the nation's Supreme Court in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The trial court impermissibly resentenced a rehabilitated Gilbert to a de facto life sentence because Gilbert committed odious crimes and without

1

the court assessing whether Gilbert's crimes reflected irreparable corruption or adjudging whether Gilbert is a rare irretrievably depraved juvenile offender. In turn, the majority's reading of the statute to permit resentencing without consideration of the *Miller* factors and to permit a de facto life sentence for multiple crimes renders RCW 10.95.030 unconstitutional. Since I disagree with my colleagues, since sentencing courts and appellate courts repeatedly snub the teachings of *Miller*, and since this appeal concerns the compelling topic of juvenile offender punishment, I assert the prerogative of penning a dissently tome.

The facts behind every juvenile offender's life sentence incorporate a heinous crime and usually depict a senseless horrific murder or murders. Jeremiah Gilbert's September 1992 inhumane assassination of two travelers and his merciless, nearly deadly, assault of a third man presents no exception, although some decisions describe even more hideous murders. *State v. Barbeau*, 370 Wis.2d 736, 883 N.W.2d 520 (2016); *State v. Boston*, 131 Nev. Adv. Op. 98, 363 P.3d 453 (2015); *Conley v. State*, 972 N.E.2d 864 (Ind. 2012). Our majority outlines those crimes. In human terms, Gilbert deserves life without parole, if not a harsher penalty, for his monstrous wrongs. Nevertheless, although Gilbert did not respect the value of life, the American judicial system does. American law values rehabilitation and mercy in addition to justice and retribution. This respect for the dignity of each man and woman and the acknowledgement of a criminal's ability to change lie inside the prohibitions found in the cruel and unusual punishment

2

clause of both the United States and the Washington Constitutions.

Jeremiah Gilbert was born on November 27, 1976.  Gilbert committed his crimes in September 1992 at age fifteen.  As part of the juvenile court decline procedure, a 1992 psychological evaluation concluded that Gilbert did not plan the murders, but he rather reacted impulsively to being confronted during his attempted truck theft.  The probation report presented at his decline hearing noted that Gilbert lacked sophistication and maturity and that he lacked the ability to process information and make decisions as an adult.  The Klickitat County juvenile court administrator then remarked that Gilbert's alcohol use influenced his criminal behavior.  Still, after a declination hearing, the adult court assumed jurisdiction over Gilbert with the trial court ruling, contrary to the undisputed conclusions of experts, that Gilbert's conduct involved sophistication and planning.

In 1993, the adult trial court, after a jury trial, convicted Jeremiah Gilbert of aggravated first degree murder, first degree murder, second degree assault, first degree burglary, first degree theft, and first degree robbery.  Washington law then mandated a life sentence without parole for a conviction of aggravated first degree murder no matter the age of the offender.  Former RCW 10.95.030.  The trial court sentenced Gilbert, while sixteen years of age, to a term of life in prison without possibility of parole for the aggravated first degree murder conviction.  The court also sentenced Gilbert to a consecutive term of twenty-three years and four months, or 280 months, for the first

3

degree murder conviction. Although the law does not label any homicide as nonaggravated first degree murder, I allot the second conviction this appellation to distinguish the two killings. The sentencing court ordered the sentences on the remaining four crimes to run concurrent with one another and concurrent with the aggravated murder conviction sentence. The sentences for the four remaining crimes bear no relevance to this appeal. Obviously, the 1993 sentence incarcerated Gilbert for his remaining life and two decades into his death.

From 1994 to 2006, Jeremiah Gilbert committed twenty-seven infractions while in prison. One infraction entailed the assault of a corrections officer. He committed a minor infraction in 2009. The State characterizes Gilbert as being a problem inmate for twelve years and a "model" citizen for less than ten years. I assume that the State references Gilbert as a recent "model" citizen partly for contrariness, but still truth lies behind the characterization. I detail Gilbert's rehabilitation below.

In *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the United States Supreme Court invalidated state statutes that mandate a juvenile sentence of life without parole for any crime. The holding, assuming *Miller* to apply retroactively, undermined Jeremiah Gilbert's sentence of life without parole pursuant to Washington's sentencing statute for aggravated first degree murder.

As a result of *Miller v. Alabama*, the 2014 Washington State Legislature amended RCW 10.95.030 and adopted RCW 10.95.035. LAWS OF 2014, ch. 130. RCW 10.95.030

4

No. 33794-4-III
*State v. Gilbert* (dissenting)


now reads, in relevant part:

> (1) Except as provided in subsections (2) and (3) of this section, any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole. . . .
>
> . . . .
>
> (3)(a)(i) Any person convicted of the crime of aggravated first degree murder for an offense committed prior to the person's sixteenth birthday shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of twenty-five years.
>
> . . . .
>
> (c) . . . During the minimum term of total confinement, the person shall not be eligible for community custody, earned release time, furlough, home detention, partial confinement, work crew, work release, or any other form of early release authorized under RCW 9.94A.728, or any other form of authorized leave or absence from the correctional facility while not in the direct custody of a corrections officer. . . .

Appendix A contains a fuller version of the statute. In turn, RCW 10.95.035 declares, in

part:

> (1) A person, who was sentenced prior to June 1, 2014, under this chapter or any prior law, to a term of life without the possibility of parole for an offense committed prior to their eighteenth birthday, shall be returned to the sentencing court or the sentencing court's successor for sentencing consistent with RCW 10.95.030. Release and supervision of a person who receives a minimum term of less than life will be governed by RCW 10.95.030.
>
> (2) The court shall provide an opportunity for victims and survivors of victims of any crimes for which the offender has been convicted to present a statement personally or by representation.

Other sections of the 2014 *Miller*-fix statute, RCW 9.94A.540 and RCW 9.94A.730, lack

relevance in this appeal because of the aggravated first degree murder conviction.

In September 2015, Jeremiah Gilbert's trial court conducted a resentencing

5

hearing in accordance with RCW 10.95.035. By that date, Gilbert had served twenty-three years in prison and was thirty-eight years of age.

As part of the resentencing process, the resentencing court appointed Ronald Roesch to evaluate Jeremiah Gilbert. Ronald Roesch is a Washington licensed psychologist, who garnered a PhD in clinical psychology from the University of Illinois in 1977. Roesch serves as a professor of psychology and director of mental health, law, and policy at Simon Fraser University. He is past president of the American Psychology-Law Society and the International Association of Forensic Mental Health. He has published over 140 articles in professional books and journals.

Ronald Roesch conducted a five-hour interview of Jeremiah Gilbert in prison. Roesch also reviewed police investigation reports, an interrogation transcript, the probation officer 1992 declination report, the criminal trial transcript, juvenile detention facility records, and Department of Corrections' records. Roesch interviewed corrections officers and Gilbert's family members.

Ronald Roesch noted, in a report to the resentencing court, that Jeremiah Gilbert transferred to an adult prison at age eighteen. According to Roesch, juveniles commonly adjust with difficulty to adult prisons as a result of the juvenile's impulsivity and impaired ability to reason. According to Roesch, this difficulty in transition explains Gilbert's twenty-seven infractions. Gilbert's assault of a corrections officer in 2006 constituted a turning point in Gilbert's life. He then began to realize the need to assume

6

responsibility for his actions. Visits from his sister and her children aided Gilbert's

transformation.

Dr. Ronald Roesch writes in his report to the resentencing court:

According to Mr. James Forbis, his counselor at Stafford Creek, "I think he grew up. He has come a long way. His last infraction was 2009, and before that 2006. He is working, taking classes, and is a dog program trainer. A lot of inmates look up to him as a role model." Officer Stella Jennings, the Corrections Unit Supervisor at Stafford Creek, confirms that Mr. Gilbert has been a model inmate, is respectful of staff and inmates, and presents with no behavioral problems.

Clerk's Paper (CP) at 42. Jeremiah Gilbert has completed numerous classes in prison and

now teaches classes in the release readiness program. Sergeant Patricia McCarty

informed Roesch that Gilbert excels in treating abused dogs and that Gilbert assumed a

leadership role among other inmates. Gilbert's life without parole sentence disqualifies

him from job training programs inside the prison.

The Personality Assessment Inventory (PAI) performed by Dr. Ronald Roesch

indicated a lack of any clinical psychopathology in Jeremiah Gilbert. The HCR-20

analysis, an assessment of risk for violence and recidivism, established that Gilbert posed

a "low risk to reoffend." CP at 45. Roesch's report quoted from a Washington State

Institute for Public Policy paper that analyzed data on violent juvenile offenders. The

report found:

. . . through age 25, only 20% of these violent young offenders were subsequently sentenced for a violent felony as an adult. Thus, the majority of violent youth do not represent a substantial long-term risk of violence.

7

The reasons for this are complex, but from a developmental perspective, it is likely due to the fact that adolescents, compared to adults, are more likely to respond impulsively, take greater risks, think less about long-term consequences of their behavior, and are more likely to be influenced by peers.

CP at 45 (footnotes omitted). Dr. Roesch's report also cited a 2009 study by the Washington Coalition for the Just Treatment of Youth that concluded:

. . . recent breakthroughs in brain development research have shown that due to anatomical differences in the adolescent brain, youth are less able than adults to assess risks, control impulsive behavior, and engage in moral reasoning.

CP at 46. Roesch opined that Gilbert, as an immature youth, impulsively committed the murders. Roesch also concluded that Gilbert has since matured.

As part of the resentencing procedure, Jeremiah Gilbert submitted letters from supporters, including a corrections officer at one of Gilbert's prisons. Gilbert asked that the resentencing court run the sentences for both murders concurrently, which would allow Gilbert to apply for parole in two years.

In a resentencing memorandum, the State asked the trial court to sentence Gilbert to a maximum term of life imprisonment and a minimum term of twenty-five years for the aggravated first degree murder conviction, as demanded by Washington's *Miller*-fix statute, and 280 months for the nonaggravated first degree murder conviction. The State argued that Washington's *Miller*-fix statute did not authorize the resentencing court to reconsider the concurrent or consecutive natures of previous sentences and that RCW

9.94A.589(1)(b), a portion of the Sentencing Reform Act of 1981, chapter 9.94A RCW, demanded separate or consecutive sentences for the two murders as serious violent crimes. The State did not argue in the memorandum that Jeremiah Gilbert's crimes showed that, at the time, Gilbert was irreparably corrupt or that Gilbert himself was irretrievably depraved.

During the resentencing hearing, Jane Edmonds, a surviving spouse of one of the two murder victims, eloquently and succinctly commented:

> It's really difficult to be here today, to stand up here, as I'm sure it is for the family of Mr. Gilbert. I know they love their son and want him to come home; but Robert and Loren have families that wanted that—who wanted them to come home also. They won't get to do that.
> Families of Mr. Gilbert can go and visit him and talk to him and share their lives with him. The last time we got to see Robert and Loren was in a coffin. He [Jeremiah Gilbert] didn't show them any mercy. Please don't show him any mercy. Twenty-five years is not long enough for murder.

Report of Proceedings (RP) at 8.

During the resentencing hearing, Jeff Coats spoke on behalf of Jeremiah Gilbert. Coats knew Gilbert in prison, Coats vouched for Gilbert's maturity, and he asked for leniency for Gilbert. Appendix B contains Jeff Coats' soliloquy.

Jeremiah Gilbert addressed the resentencing court:

> I don't know if I'll ever have an opportunity again to personally express my remorse and—and—and my I'm sorry to the victims; not only the—the families of the—the two men that I murdered but the victims I made of the people that work in this courtroom and the victims I made of my family having to go through all they go through to continue to continue

9

to—to stand by me and support me.

There's—and—and I've grown into a—a man a lot like my father and I'd like to fix things and—and work on them and do a lot of crafts and stuff and I'm—I'm dealt the hand that can never be fixed and I've got to carry that whether I'm inside or out. It's—that'll be forever.

I completely understand the—the victims' families' wish of forever. I get that. I mean, I'm not going to sit and—and ask for concurrent, not consecutive, that's beyond my means. All I can—all I can ask is that you take the time to read the—the letters of support and realize that reform is possible if I choose it and I have chosen such. Thank you.

RP at 17-18.

During the resentencing hearing, the resentencing court asked questions that suggested that the court believed that, even with a consecutive sentence for the nonaggravated first degree murder conviction, Gilbert could seek parole in one to two years. Counsel for both parties may have contributed to this erroneous belief. During the hearing, the State never contended that Jeremiah Gilbert was irretrievably depraved or that his crime reflected irreparable corruption. The State never disagreed with the 1992 probation report that noted that Gilbert, when he committed the crimes, lacked sophistication and maturity and that he lacked the ability to process information and make decisions as an adult. The State never disputed Ronald Roesch's conclusions that Gilbert presented a low risk of reoffending and that Gilbert underwent rehabilitation.

The resentencing court, at the request of the State and pursuant to RCW 10.95.030 (3)(a)(i), reduced Jeremiah Gilbert's sentence for aggravated first degree murder from life without parole to an indeterminate sentence of a maximum of life and a minimum of

10

twenty-five years. The resentencing court rejected Gilbert's request to change the 280-months' consecutive sentence for nonaggravated first degree murder to a sentence concurrent with the sentence for the aggravated first degree murder.

At the conclusion of the resentencing hearing, the trial court declared:

> Well, I've read the risk assessment of the defendant and it says many good things about the defendant. Mr. Gilbert, you speak very—very well and articulately on your own behalf as well and there's no reason that I cannot believe all of those things that you've done on your own behalf and the behalf of others and it seems likely, given your demeanor and your temperament and what I'm hearing now that you'll continue to do those things.
>
> I've given thought to this and poured over what the facts are. I think even Mr. Gilbert would agree that *this was a heinous crime*, that he gratuitously and senselessly executed at least one person, he's admitted to that and the question before the Court then on resentencing is whether the two hundred and eighty months consecutive to the twenty-five under life sentence, minimum, is justice given all of the circumstances in the context of everything I know or whether in the context of everything I know, justice requires me to agree with Mr. Lanz [defense counsel] and reduce that—I—by sentencing concurrently.
>
> So I am finding right now that I am adopting the State's position in-toto and I am agreeing with their analysis of the law and the statute and I am therefore sentencing you to twenty-five years with a life sentence plus two hundred and eighty months consecutive. I am disagreeing with your position. I wish you the best of luck within the prison system and perhaps the parole board will see it your way sometime soon.
>
> I think the victims have to understand that that's outside of my ambit. If the parole board kicks you out that's what the parole board does and it looks to me, based on what I've read, that you stand a pretty good possibility of that. So that's the rule of the Court.

RP at 19-20 (emphasis added). The trial court never mentioned whether it concluded that

Jeremiah Gilbert's crimes reflected transient immaturity or constituted a rare case of an

11

irretrievably depraved teenager.

On appeal, Jeremiah Gilbert contends the resentencing court failed to suitably apply and consider the *Miller* factors, particularly the youthfulness and impulsiveness of Gilbert at age fifteen when he committed the crimes. I agree. I also agree with my Division Two colleagues to the unconstitutionality of Washington's *Miller*-fix statute.

Consecutive Sentences

The fact that Jeremiah Gilbert committed two murders that led to consecutive sentences looms large in this appeal. Both the sentencing court and the resentencing court imposed consecutive sentences for the homicides. On appeal, Gilbert agrees that the Washington Sentencing Reform Act authorizes the consecutive sentences, but he argues that the resentencing court should have run the sentences concurrently as an exceptional downward sentence under Washington law and to satisfy constitutional sentencing restraints imposed by *Miller v. Alabama*.

RCW 9.94A.589, a critical fraction of the Sentencing Reform Act, addresses the circumstances under which the sentencing court orders consecutive sentences for two or more pending crimes and concurrent sentences for two or more pending crimes. The statute declares, in part:

> (1)(a) Except as provided in (b), (c), or (d) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score. . . . Sentences imposed under this subsection

12

shall be served concurrently. Consecutive sentences may only be imposed
under the exceptional sentence provisions of RCW 9.94A.535. . . .
　　　(b) Whenever a person is convicted of two or more *serious violent
offenses arising from separate and distinct criminal conduct*, the standard
sentence range for the offense with the highest seriousness level under
RCW 9.94A.515 shall be determined using the offender's prior convictions
and other current convictions that are not serious violent offenses in the
offender score and the standard sentence range for other serious violent
offenses shall be determined by using an offender score of zero. . . . *All
sentences imposed under this subsection (1)(b) shall be served
consecutively to each other* and concurrently with sentences imposed under
(a) of this subsection.

RCW 9.94A.589 (emphasis added). Under RCW 9.94A.030(46)(a)(i), a "serious violent

offense" is a subcategory of violent offenses and includes murder in the first degree.

Jeremiah Gilbert characterizes the 280-months' sentence for nonaggravated first

degree murder as a mandatory minimum sentence. According to Gilbert, he lacks

eligibility for parole until the end of the two hundred and eighty month term, which does

not begin to run until the expiration of the twenty-five year minimum sentence for

aggravated first degree murder. Therefore, according to Gilbert, he may not seek parole

from the indeterminate sentence review board until 2037, when he will be sixty years old.

The State will have then incarcerated him for forty-five years. The State concedes that

Gilbert will reach at least the age of sixty before the review board will even consider

parole. Of course, the indeterminate sentence review board could deny parole even at the

age of sixty.

Jeremiah Gilbert frames his solo assignment of error as: the resentencing court

failed to appropriately apply the *Miller* factors at the resentencing hearing resulting in a sentence that constitutes a de facto life sentence. This assignment raises two discrete questions. First, did Gilbert's resentencing constitute a de facto life sentence? Second, did the trial court fail to appropriately apply the *Miller* factors? I will address these, along with other legal questions, not necessarily in such order. The answers to both questions, based on the federal constitution's cruel and unusual punishment clause and the Washington Constitution's cruel and unusual punishment clause, is yes. The answers begin with a review of *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

## Miller v. Alabama

The Eighth Amendment to the United States Constitution reads: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis added.) The Eighth Amendment applies to the states through the Fourteenth Amendment. *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

The framers of the Bill of Rights principally intended the Eighth Amendment to preclude barbaric or torturous methods of punishment. *Harmelin v. Michigan*, 501 U.S. 957, 979, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (opinion of Scalia, J.). Later, the United States Supreme Court extended the reach of the Eighth Amendment to grossly disproportionate sentences based on the nature of the offense or the characteristics of the

14

offender. *Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed. 793

(1910). A sentence disproportionate to the crime or undeserving of the offender

constitutes cruel and unusual punishment. In other variations of Eighth Amendment

jurisprudence, the Court has elongated the coverage of the cruel and unusual punishment

clause to circumstances when punishment may be imposed in an arbitrary and

unpredictable fashion. *Kennedy v. Louisiana*, 554 U.S. 407, 436, 128 S. Ct. 2641, 171 L.

Ed. 2d 525 (2008). Finally, the Court has also determined a punishment to be cruel and

unusual when the sentence serves no penological purpose. *Graham v. Florida*, 560 U.S.

48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 571

(2005). Stated differently, a sanction is beyond the State's authority to inflict if it makes

no measurable contribution to acceptable penal goals. *Weems v. United States*, 217 U.S.

at 367. Lengthy sentences for juvenile offenders implicate the last three purposes served

by the cruel and unusual punishment clause.

The issue on appeal concerns the resentencing of Jeremiah Gilbert for crimes

Gilbert perpetuated when fifteen years old. The United States' history of the treatment of

juvenile offenders resembles a swinging pendulum. During colonial days and well into

the 19th century, the legal system treated children as young as seven as adults subject to

adult punishments, including the death penalty. CHILDHOOD, YOUTH, AND SOCIAL

WORK IN TRANSFORMATION: IMPLICATIONS FOR POLICY AND PRACTICE (Lynn M.

Nybell, Jeffrey J. Shook & Janet L. Finn eds. 2009). Changing demographic, social and

economic conditions created a trend, by the mid-1800s, to seek reform, rather than punishment, for juvenile offenders. In 1899, Illinois formed the first juvenile court based on the underlying assumption that minors were more amenable to rehabilitation than adult criminals. ELIZABETH J. CLAPP, MOTHERS OF ALL CHILDREN: WOMEN REFORMERS AND THE RISE OF JUVENILE COURTS IN PROGRESSIVE ERA AMERICA 19 (1998). Rising crime rates and academics' and the media's creation of the phantom juvenile super-predator swung the pendulum in the 1980s toward harsher punishment and prosecuting youth in adult court for violent crimes. JEFFREY BUTTS & JEREMY TRAVIS, URBAN INSTITUTE JUSTICE POLICY CENTER, THE RISE AND FALL OF AMERICAN YOUTH VIOLENCE: 1980 to 2000 (2002). Advances in social science and physiological science now oscillate the pendulum again.

The United States Supreme Court has declared that children are "constitutionally different" from adults for purposes of sentencing. *Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). One could read this declaration to refer to children's mental, physical, and emotional compositions differing from the rational, somatic, and psychic makeup of adults, but the Court likely intended to state that children differ from adults under the United States Constitution. Both statements are accurate.

According to the United States Supreme Court, the penal system should treat offenders under the age of eighteen differently. Children's lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless

16

risk taking. *Miller v. Alabama*, 567 U.S. at 471. Children are also more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings. *Miller v. Alabama*, 567 U.S. at 471. Because a child's character is not as well formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of irretrievable depravity. *Miller v. Alabama*, 567 U.S. at 471. Commonsense, parental knowledge, physical science, and social science confirm these observations. *Miller v. Alabama*, 567 U.S. at 472 n.5. Only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. *Roper v. Simmons*, 543 U.S. at 570 (2005). Adolescent brains are not yet fully mature in regions and systems related to higher order executive functions such as impulse control, planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. at 475 n.5. All of these features are crime specific. *Miller v. Alabama*, 567 U.S. at 473. Youth is more than a chronological fact, it is a time of immaturity, irresponsibility, impetuousness, and recklessness. *Roper v. Simmons*, 543 U.S. at 569.

Immaturity does not end at age eighteen. The parts of the brain involved in behavioral control continue to develop well into a person's 20s. *State v. O'Dell*, 183 Wn.2d 680, 692 n.5, 358 P.3d 359 (2015). The dorsal lateral prefontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early twenties. *State v. O'Dell*, 183 Wn.2d at 692 n.5.

The distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. *Miller v. Alabama*, 567 U.S. at 472. Deterrence supplies a flawed rationale for punishment because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller v. Alabama*, 567 U.S. at 472. Jeremiah Gilbert initially received a sentence of life without parole. Retribution's focus on blameworthiness does not justify a life without parole sentence because juveniles have severely diminished moral culpability. *Miller v. Alabama*, 567 U.S. at 472. Incapacitation fails to justify a long sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller v. Alabama*, 567 U.S. at 472-73. In other words, incorrigibility is inconsistent with youth. *Graham v. Florida*, 560 U.S. 48, 72-73, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Finally, rehabilitation does not justify a life without parole sentence because such a sentence precludes hope for a child's ultimate rehabilitation. *Miller v. Alabama*, 567 U.S. at 473. At least with respect to life without parole for juvenile nonhomicide offenders, if not for homicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification. *Graham v. Florida*, 560 U.S. at 71.

In 1993, Jeremiah Gilbert's sentencing court ordered him to serve a lifetime sentence without parole in addition to another 280 months' incarceration. The United

States Supreme Court has since issued four important decisions concerning juvenile offender sentencing: *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); and *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016). *Roper* held capital punishment impermissible under the cruel and unusual punishment clause for offenders who commit crimes before the age of eighteen. Although *Roper* concerned the death penalty, its teaching regarding juvenile offenders extends to life without parole.

In *Graham v. Florida*, the high Court held a lifetime sentence for a youth convicted of a nonhomicidal crime to be unconstitutional because of characteristics of youth, among other reasons. Although *Graham* involves crimes other than homicide, its doctrine and other cases involving long sentences for nonhomicide crimes extends to juvenile offenders who commit murder. For youth, life without parole presents an especially harsh punishment because the juvenile will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender. *Graham* likened life without parole sentences to the death penalty for juveniles. The *Graham* Court observed:

> [A] categorical rule [barring life without parole sentences] gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the

foundation for remorse, renewal, and rehabilitation. A young person who
knows that he or she has no chance to leave prison before life's end has
little incentive to become a responsible individual. In some prisons,
moreover, the system itself becomes complicit in the lack of development.
. . . A categorical rule against life without parole for juvenile nonhomicide
offenders avoids the perverse consequence in which the lack of maturity
that led to an offender's crime is reinforced by the prison term.

560 U.S. at 79. The Graham court quoted *Naovarath v. State*, 105 Nev. 525, 526, 779

P.2d 944 (1989):

"[This sentence] means denial of hope; it means that good behavior
and character improvement are immaterial; it means that whatever the
future might hold in store for the mind and spirit of [the convict], he will
remain in prison for the rest of his days."

(Some alterations in original.)

*Graham* noted that corrections facilities often deny defendants serving life without

parole with access to vocational training and other rehabilitative services that are

available to other inmates. For juvenile offenders, who are most in need of and receptive

to rehabilitation, the absence of rehabilitative opportunities or treatment makes the

disproportionality of the sentence all the more evident. *Graham v. Florida*, 560 U.S. at

74. The Washington Department of Corrections has denied Jeremiah Gilbert job training

programs.

During the same week that it issued its historic ruling on Obamacare, the United

States Supreme Court partially extended its ruling in *Graham v. Florida* to offenders who

committed homicide, in the then unnoticed decision of *Miller v. Alabama*, 567 U.S. 460

20

(2012). In *Miller*, the Court struck down state laws mandating life without parole sentences for juveniles found guilty of even aggravated first degree murder. The Court strongly inferred, if not held, that no juvenile could receive a lifetime sentence for any crime unless the sentencing court finds the juvenile to be a "rare juvenile offender whose crime reflects irreparable corruption." *Miller v. Alabama*, 567 U.S. at 479-80. Because of the constitutional nature of children, including teenagers, the *Miller* Court mandated that a sentencer follow a process that incorporates consideration of the offender's chronological age and its hallmark features and other mitigating features before imposing life without parole. The attended characteristics include: chronological age, immaturity, impetuosity, failure to appreciate risks and consequences, the surrounding family and home environment, the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and any pressures from friends or family affecting him, the inability to deal with police officers and prosecutors, incapacity to assist an attorney in his or her defense, and the possibility of rehabilitation. *Miller v. Alabama*, 567 U.S. at 477. The Court noted that the appropriate occasion for sentencing a juvenile homicide offender to life without parole will be "uncommon." *Miller v. Alabama*, 567 U.S. at 479.

The majority decision, in *Miller v. Alabama*, as do all decisions invalidating a punishment under the cruel and unusual punishment clause, drew fervent dissents. Chief Justice Roberts, in dissent, argued that a decent society protects the innocent from

21

violence. A mature society may determine that safety requires removing those guilty of the most heinous murders from its midst, both as protection for its other members and as a concrete expression of its standards of decency. Legislators, not judges, should determine standards of decency and punishment. Roberts noted that, by the 1980s, public outcry against repeat offenders, broad disaffection with the rehabilitative model, and other factors led legislatures to reduce or eliminate the possibility of parole, imposing longer sentences in order to punish criminals and prevent them from committing more crimes.

Courts that declare legislative sentencing schemes unconstitutional, including the *Miller* Court, face ardent criticism. Critics assert that legislatures, not courts, hold the prerogative to determine the fairness, morality, and justness of criminal punishment. Decriers lament that five judges, who in 2012 personally objected to life without parole, outlawed the practice despite most states, including Washington State, permitting the punishment. According to critics, the subjective values of judges should not control state sentencing schemes.

As previously written, before *Miller*, Washington imposed a mandatory sentence of life without parole for aggravated first degree murder regardless of the offender's age. Former RCW 10.95.030 (1993). In response to *Miller*, the 2014 legislature amended RCW 10.95.030 with purported *Miller*-provisions. We call the statute the *Miller*-fix statute. This opinion previously quoted some of the relevant subsections of the statute.

22

For one convicted of aggravated first degree murder for a homicide committed before age sixteen, the offender receives a maximum term of life imprisonment and a minimum term of total confinement of twenty-five years. One-half year before expiration of the minimum term, the Department of Corrections shall review the current status of the offender and report to the indeterminate sentence review board. The board shall release and place the offender on community custody if the board determines the offender unlikely to reoffend. If the board does not release the offender, the board establishes another minimum term not to exceed an additional five years.

After Washington's *Miller*-fix statute, the nation's high Court, in *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016), readdressed the subject of life without parole sentences for juvenile homicide offenders. *Montgomery* held that *Miller* applied retroactively to offenders who were juveniles when they committed their crimes. Against contentions that the *Miller* ruling only imposed a procedure for resentencing, the Court announced that *Miller* established a substantive rule that juveniles, whose crimes reflect "only transient immaturity" and who have since matured, will not be forced to serve a life without parole sentence. *Montgomery v. Louisiana*, 136 S. Ct. at 736. The Court wrote:

> The [*Miller*] hearing does not replace but rather gives effect to
> *Miller*'s substantive holding that life without parole is an excessive
> sentence for children whose crimes reflect transient immaturity.

136 S. Ct. at 735. Conversely, the Eighth Amendment mandates parole eligibility for

juvenile murderers whose crimes reflect only transient immaturity. Life without parole is constitutional only for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition that children who commit even heinous crimes are capable of change. The Court qualified its ruling by declaring that *Miller* did not require a finding of fact regarding a child's irreparable corruption before a juvenile could be sentenced to life without parole.

Courts lower than the United States Supreme Court would benefit by reading *State v. Veal*, 298 Ga. 691, 784 S.E.2d 403 (2016). Before *Montgomery*, the Georgia Supreme Court viewed *Miller* as imposing only a procedure. In *Veal*, the Georgia Supreme Court finally took *Miller* seriously because of *Montgomery*'s holding that *Miller* impresses the substantive requirement that the sentencing court determine the irretrievably depraved nature, or lack thereof, of the offender.

Since *Miller*, state courts have issued a downpour of decisions and federal courts have published a drizzle of opinions centering on sentencing of juvenile homicide offenders. The majority of decisions utilizes sundry sophistry and employs rickety rationalizations to ignore the letter and spirit of *Miller* and other Supreme Court decisions in order to effectuate life in prison for juvenile offenders. Courts adopt a narrow, literal interpretation of *Miller* rather than following the spirit of *Miller*. Appendix C nonexhaustively lists tactics and arguments used to avoid *Miller* and *Montgomery*.

24

Language in the United States Supreme Court rulings of *Miller* and *Montgomery* begs many questions. In turn, rulings in the two landmark decisions construct practical, procedural, forensic, and substantive, if not theological, complexities and complications. Some courts seize on these complications to avoid *Miller*'s and *Montgomery*'s doctrine. Reviewing the anomalies arising from *Miller* and *Montgomery* permits a clearer analysis of the issues presented in Jeremiah Gilbert's appeal. Discussing the intricacies of the two decisions also constructs a platform for an examination of this court's recent *Bassett* decision.

*Miller* and *Montgomery* repeatedly reference a life without parole sentence and presumably distinguish this sentence from a life with the possibility of parole sentence. One wonders about the application of *Miller* if a state lacks a parole system, but a state sentencing court sentences the juvenile offender to a life sentence. Presumably, the Supreme Court would require this sentencing court to review the *Miller* factors before sentencing the offender to a life sentence, but then the offender lacks the ability for release from prison during his lifetime even if he achieves complete rehabilitation.

*Miller* and *Montgomery* bar mandatory life without parole sentences. The decisions do not expressly preclude discretionary life without parole sentences. Presumably, some facts must exist before a sentencing court may impose, on a discretionary basis, a sentence of life without parole. Otherwise all discretionary sentences could become in effect mandatory. As one state court noted, *Miller*'s

25

reasoning extends beyond mandatory sentencing schemes. *Casiano v. Commissioner of Correction*, 317 Conn. 52, 115 A.3d 1031, 1037 (2015). An offender receives the same sentence regardless of whether a statute mandates a life without parole sentence or the judge imposes his or her own life without parole sentence. Presumably the facts that must exist, before a discretionary life without parole sentence, is a character flaw in the juvenile offender or a crime that reflects a character blemish.

In Appendix D, I list various terms employed by *Miller*, *Montgomery*, and other decisions when marking the only type of juvenile offender subject to life imprisonment. For purposes now, I mention that United States Supreme Court opinions permit a state court to impose a life sentence without parole on only "the rare juvenile offender whose crime reflects *irreparable corruption*." *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. at 734 (2016); *Miller v. Alabama*, 567 U.S. at 480 (2012); *Roper v. Simmons*, 543 U.S. at 573 (2005) (emphasis added). The term "corruption" fits ill in the setting of juvenile offenders. The word "corruption" generally denotes someone in power willing to act dishonestly in return for money or personal gain or for continued power. According to the legal dictionary, "corruption" constitutes a form of dishonest or unethical conduct by a person entrusted with a position of authority, often to acquire personal benefit. LEGAL DICTIONARY, https://legaldictionary.net/corruption/ (last visited Mar. 23, 2018). Juvenile offenders lack a position of authority or power and often do not kill for personal gain. Juvenile murders often lack a motivation of dishonesty.

26

*Montgomery* and *Miller* also employ the phrases "permanent incorrigibility" and "irretrievable depravity." *Montgomery v. Louisiana*, 136 S. Ct. at 733-35 (2016); *Miller v. Alabama*, 567 U.S. at 471, 473, 490 (2012). *Graham v. Florida*, 560 U.S. at 75 (2010) introduced the word "irredeemable."

The Court's phraseology begs the questions: How does a sentencing court measure irreparable corruption, permanent incorrigibility, irretrievable depravity, or irredeemability when deciding whether a juvenile offender qualifies for a life without parole sentence? Judges would readily agree that some historical examples, such as Adolph Hitler, Jeffrey Dahmer, Osama bin Laden, and Charles Manson deserve this appellation. Yet Hitler and bin Laden committed no crimes as a youth, and Manson perpetuated only petty crimes as a youth. Dahmer killed his first victim at age eighteen, but committed no previous crimes. Dylan Klebod was seventeen at the time of the Columbine Massacre. Eric Harris was age eighteen. Klebold and Harris, unlike Jeremiah Gilbert, planned their murders days in advance and armed themselves with weapons and ammunition to kill scores. Gilbert in a moment of panic grabbed a rifle that his companion pilfered from the companion's father in order to shoot deer. Gilbert does not parallel historic examples of irretrievable depravity.

The terms irreparable corruption, permanent incorrigibility, irretrievable depravity and irredeemability pose more as theological, than penological, concepts and connote an aura of unforgivable or irreversible sinfulness. In a nation with a majority of Christians

27

that believe in salvation and grace for even the worst of sinners, one questions whether American society and American law should deem anyone irretrievably depraved or irredeemable.

Forensic psychiatrist Michael Welner, M.D., seeks to find a consensus among the citizenry as to what constitutes "depravity" in order to minimize the arbitrariness of how courts determine the worst of crimes. The study will develop a "depravity standard," and one can participate in Welner's survey through the World Wide Web. Michael Welner, *The Depravity Standard*, https://depravitystandard.org/ (last visited Mar. 23, 2018), will promote the standard for use in the American judicial system. Notably Welner excludes from participation, in his survey, those under the age of eighteen.

*Miller* and *Montgomery* distinguished between juvenile offenders whose crimes reflect "unfortunate yet transient immaturity" and "the rare juvenile offenders whose crimes reflect irreparable corruption." *Miller*, 567 U.S. at 479-80; *Montgomery*, 136 S. Ct. at 734. This language suggests a bright dividing line between two classes of juvenile offenders. The language may generate two mutually exclusive categories of offenders. Nevertheless, the court system may encounter a rare juvenile offender who straddles the line between the two classifications and even one or more offenders who meander back and forth across the line of demarcation.

The Supreme Court's promoting of two hermetic categories of juvenile offenders introduces another intricacy from *Miller* and *Montgomery*. One wonders how a

28

sentencing judge can render a trustworthy determination of whether a juvenile offender's

crime signifies immaturity or signals permanent incorrigibility. An informed sentencing

decision could require days of testimony and days of thought, and courts lack time for

long sentencing hearings.

A decision as to whether a crime reflects "unfortunate yet transient immaturity" or

the rare occasion of "irreparable corruption" commands review of psychological

evidence. Nevertheless, even expert psychologists encounter difficulty in differentiating

between the juvenile offender whose crime reflects unfortunate yet transient immaturity

and the rare juvenile offender whose crime reflects irreparable corruption. *Graham v.*

*Florida*, 560 U.S. at 68 (2010). A rule even forbids psychiatrists from diagnosing any

patient under eighteen as having antisocial personality disorder, a disorder also referred

to as psychopathy or sociopathy, and which is characterized by callousness, cynicism,

and contempt for the feelings, rights, and suffering of others. American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR 701-06

(4th ed. text rev. 2000), cited in *Roper v. Simmons*, 543 U.S. at 572-74 (2005). The

*Miller* Court offered the difficulty encountered even by experts as a reason why life

without parole will be uncommon. *Miller v. Alabam*a, 567 U.S. at 479 (2012). Lower

courts ignore this passage from *Miller* and instead employ the difficulty in order to render

de facto life sentences for heinous crimes.

Note that the language in *Miller* and *Montgomery* does not target immature

offenders or irretrievably depraved offenders. The high Court decisions instead refer to juvenile offenders "whose crimes reflect transient immaturity" and juveniles whose "crimes reflect irretrievable corruption." *Miller*, 567 U.S. at 479-80; *Montgomery*, 136 S. Ct. at 734. Accordingly, the sentencing court focuses on the nature of the crime, not the character of the offender. Nevertheless, crimes are not immature. Youth are immature. Transgressions are not irretrievably depraved. People are depraved.

The *Miller* Court directed sentencing courts to weigh factors when sentencing a juvenile offender. Those factors include the chronological age of the offender at the time of the crime, the juvenile's immaturity, the offender's impetuosity, the juvenile's failure to appreciate risks and consequences, the juvenile offender's surrounding family and home environment, the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and any pressures from friends or family affecting him, the offender's inability to deal with police officers and prosecutors, the juvenile's incapacity to assist an attorney in his or her defense, and the juvenile offender's possibility of rehabilitation. *Miller*, 567 U.S. at 477. Some of these factors entail the circumstances of the crime. Most of these factors emphasize the characteristics of the offender, not the crime. Thus, a court's review of the *Miller* factors entails more a review of the person than the wrongful conduct.

The *Miller* and *Montgomery* holdings imply that the trial court must render the individualized determination of irreparable corruption, taking into account the prospect of

30

rehabilitation, at the time of the sentencing. *Newton v. State*, 83 N.E.3d 726, 744 (Ind. Ct. App. 2017). The Supreme Court in *Miller* declared that the Eighth Amendment requires sentencing courts to exercise their discretion at the time of sentencing itself, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 2468-72 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20, 391 P.3d 409 (2017). In *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017), our Supreme Court ruled that the resentencing court must primarily look at the traits of the offender at the time of the crime. Under these principles, the sentencing court will render its decision while the juvenile has yet to mature, except for resentencing hearings for offenders sentenced before *Miller*. If the sentencing court judges the case on the characteristics of the offender, not merely the characteristics of the crime, the court will receive no evidence of the offender's rehabilitation or lack thereof. Since science informs us that a juvenile's brain does not fully form and the teenager's reasoning skills do not fully develop until his twenties, a court will encounter difficulty in assessing "irretrievable depravity" at the time of sentencing.

*Graham* demands that the state afford a juvenile offender serving a life sentence or its functional equivalent to "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 75 (2010); *State v. Scott*, 196 Wn. App. 961, 966, 385 P.3d 783 (2016), *review granted*, 188 Wn.2d 1001, 393 P.3d 362 (2017); *State v. Rivera*, 177 Conn. App. 242, 172 A.3d 260, 265

(2017). A demonstration of maturation and rehabilitation comes years after sentencing. Assessing, at the time of initial sentencing, whether the offender should receive life without parole, conflicts with this principle. For this reason, some resentencing courts permit introduction of the offender's postconviction conduct in prison. *State v. Ramos*, 187 Wn.2d 420, 449, 387 P.3d 650 (2017). Under this context, one wonders about the constitutionality of my previous hypothetical situation when a state lacks a parole system and the juvenile offender receives a life sentence.

To repeat, *Graham* and *Miller* do not require that the state guarantee freedom to a juvenile offender, but require the State to afford a juvenile offender serving a life sentence or its functional equivalent "to some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller v. Alabama*, 567 U.S. at 479 (2012); *Graham v. Florida*, 560 U.S. at 75 (2010). Note use of the word "opportunity." A state conceivably could continually afford a juvenile offender an opportunity to obtain release, but always deny that opportunity even if the offender shows rehabilitation. This anomaly appears acceptable to the State and the majority in Jeremiah Gilbert's appeal. Hopefully, however, the implication of the rulings requires the State to release the offender before he reaches old age, if he demonstrates maturity or rehabilitation. Otherwise, the State fails to grant a meaningful opportunity. Presumably *Montgomery* ruled that *Miller* imposed a substantive rule for this reason.

*Miller* and *Montgomery* failed to address which party carries the burden of proving

either passing puerility or irreparable corruption. In *State v. Ramos*, 187 Wn.2d at 445-46 (2017), our state high court answered this question by imposing the burden on the offender. The court reasoned that, pursuant to the Washington Sentencing Reform Act, the offender carries the burden of proving justification for an exceptional sentence below the standard range. This reasoning fails to note that a sentencing court's *Miller* review arises from a constitutional imperative, not from a state sentencing act. In so ruling, the *Ramos* court relied on a Pennsylvania decision, *Commonwealth v. Sanchez*, 614 Pa. 1, 66-77, 36 A.3d 24 (2011). The *Ramos* court did not have available a more recent Pennsylvania decision, *Commonwealth v. Batts*, ___ Pa. ___, 163 A.3d 410 (2017).

The Pennsylvania Supreme Court, in *Commonwealth v. Batts*, held that a faithful application of *Miller* and *Montgomery* requires the creation of a presumption against sentencing a juvenile offender to life without possibility of parole. 163 A.3d at 447. To rebut the presumption, the Commonwealth maintains the burden to prove, beyond a reasonable doubt, the permanent incorrigibility of and inability for rehabilitation of the juvenile offender. This burden stems from the notion that the life sentence may be imposed only on the rarest of juvenile offenders and only in exceptional circumstances. The Pennsylvania court concluded that expert testimony would not be required to rebut the presumption against permanent incorrigibility beyond a reasonable doubt, but noted that, given the presumption against life without parole and the Commonwealth's burden beyond a reasonable doubt to rebut the presumption, the Commonwealth may deem

33

expert testimony necessary. The State of Washington presented no testimony to establish irreparable corruption or irretrievable depravity of Jeremiah Gilbert, let alone expert testimony.

In line with the Pennsylvania high court, the Iowa Supreme Court observed that, if a life sentence without parole could ever be imposed on a juvenile offender, the state possessed the burden to show that an individual offender manifested "irreparable corruption." *State v. Sweet*, 879 N.W.2d 811, 833 (Iowa 2016). In making such a determination, findings of such irreparable corruption should be rare and uncommon.

The Washington Supreme Court, in *State v. Ramos*, 187 Wn.2d 420 (2017), also ignored the principle that one who relies on an exception to a general rule bears the burden of proving that the case falls within the exception. 29 AM. JUR. 2d *Evidence* § 176 (2017); *Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co.*, 205 U.S. 1, 10, 27 S. Ct. 407, 51 L. Ed. 681 (1907); *Fennell v. Ferreira*, 133 N.J. Super. 63, 67-68, 335 A.2d 84 (Law Div.1975); *In re St. Lawrence Corp.*, 248 B.R. 734, 740-41 (D.N.J. 2000); *Clubb v. Hetzel*, 165 Kan. 594, 198 P.2d 142, 147 (1948). *Miller* and *Montgomery* preach that the juvenile offender subject to a life sentence should be rare. *Miller* posits a central intuition—that children who commit even heinous crimes are capable of change. *Montgomery v. Louisiana*, 136 S. Ct. at 736 (2016). If a party contends otherwise or argues the presence of rare circumstances, that party should carry the burden of proof.

In light of the imperatives of *Miller* and *Montgomery*, Washington's *Miller*-fix

statute, RCW 10.95.030, also raises difficult, if not unresolvable, questions. In fairness to

the Washington State Legislature, any legislative body will encounter difficulty in

constructing comprehensive rules to comply with the United States Supreme Court

rulings. To repeat, the statute reads, in relevant part:

> (3)(a)(i) Any person convicted of the crime of aggravated first
> degree murder for an offense committed prior to the person's sixteenth
> birthday shall be sentenced to a maximum term of life imprisonment and a
> minimum term of total confinement of twenty-five years.
> (ii) Any person convicted of the crime of aggravated first degree
> murder for an offense committed when the person is at least sixteen years
> old but less than eighteen years old shall be sentenced to a maximum term
> of life imprisonment and a minimum term of total confinement of no less
> than twenty-five years. A minimum term of life may be imposed, in which
> case the person will be ineligible for parole or early release.
> (b) In setting a minimum term, the court must take into account
> mitigating factors that account for the diminished culpability of youth as
> provided in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) including, but not
> limited to, the age of the individual, the youth's childhood and life
> experience, the degree of responsibility the youth was capable of
> exercising, and the youth's chances of becoming rehabilitated.

RCW 10.95.030. Note that, if the offender committed the murder at age sixteen or

seventeen, the sentencing court may impose a minimum term greater than twenty-five

years, in which event the court must consider the *Miller* factors in weighing the number

of years to impose. If the offender committed the murder below age sixteen, as did

Jeremiah Gilbert, the statute compels the sentencing court to impose a minimum term of

confinement of twenty-five years. In this instance, the sentencing court never ponders

the *Miller* factors. *Miller* expressly only applied to life sentences. Nevertheless, such a

mandatory minimum that ignores *Miller* factors may raise constitutional concerns.

According to *Montgomery*, *Miller* contains a substantive rule. Presumably the rule demands release of a juvenile offender after a date that the offender achieves rehabilitation. But no one knows when. Perhaps the cruel and unusual punishment clause demands that some juvenile homicide offenders already rehabilitated be released within twenty-five years of imprisonment. If so, Washington's *Miller*-fix statute violates the constitution.

Under RCW 10.95.030, the sentencing court does not impose a definite sentence. Instead, the court imposes a minimum and maximum sentence with opposite ends that could vary in decades. Nevertheless, *Miller* constraints may demand that the sentencing court impose a more definite sentence if the court does not find the juvenile offender irreparably corrupt. Otherwise, the juvenile offender may remain incarcerated beyond his or her rehabilitation. A legislative fix may need to offer term-of-years-sentencing options for trial courts and provide for subsequent judicial review of lengthy sentences as afforded by the Florida Legislature. *Horsley v. State*, 160 So.3d 393, 407 (Fla. 2015).

The *Miller*-fix statute looks at circumstances at the end of the minimum term. In *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), the Supreme Court of Iowa determined that a statute mandating a sentence of incarceration in a prison for juvenile offenders with no opportunity for parole until a minimum period of time has been served is unconstitutional under article I, section 17 of the Iowa Constitution.

In this vein, RCW 10.95.030(f) declares, in part:

> No later than one hundred eighty days prior to the expiration of the person's minimum term, the department of corrections shall conduct, and the offender shall participate in, an examination of the person, incorporating methodologies that are recognized by experts in the prediction of dangerousness, and including a prediction of the probability that the person will engage in future criminal behavior if released on conditions to be set by the board. The board may consider a person's failure to participate in an evaluation under this subsection in determining whether to release the person. The board shall order the person released, under such affirmative and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released. . . .

Under subsection (f), the Washington *Miller*-fix statute assumes that the indeterminate sentence review board will determine whether to release the offender. *Miller* and *Montgomery* assume that a court, not a board, will determine the sentence of the offender at the time of sentencing, not years or decades later. The statute does not address whether the board must assign counsel to the offender and whether the board must conduct an evidentiary hearing. The statute provides for no judicial review of the board's decision, and, assuming the statute implies judicial review, does not mention the standard of review a court should utilize.

Under RCW 10.95.030(f), the board must order the juvenile offender released unless the board determines by a preponderance of the evidence that the offender will likely commit new criminal law violations if released. One questions if the constitution demands that the State carry the burden of proof of new violations beyond a reasonable

doubt. The statutory subsection references "criminal law violations" without limiting the nature or seriousness of the qualifying crimes. A juvenile offender should not remain incarcerated because of a likelihood of committing a petty crime if released. Finally, one wonders if proving that the offender will likely commit a crime comports with the constitutional requirement that the offender should be released unless found irretrievably depraved or irredeemable.

Another problem inherent in Washington's *Miller*-fix statute is its reliance on the possibility of parole as the complying mechanism to the *Miller* ruling. The United States Supreme Court, in *Montgomery v. Louisiana*, 136 S. Ct. at 736 (2016), wrote that a state may remedy a *Miller* violation by permitting juvenile offenders to be considered for parole, rather than resentencing them. Nevertheless, a juvenile offender might successfully argue that the vagary of parole falls short of constitutional muster at least at the initial sentencing. Along these lines, even if Jeremiah Gilbert could seek early release or parole after the running of the twenty-five-year minimum sentence for aggravated first degree murder and during the running of the twenty-three years and four months for nonaggravated first degree murder, the legality of which both parties deny, the possibility of release would not cure the sentence. The State raised this argument in *State v. Ronquillo*, 190 Wn. App. 765, 361 P.3d 779 (2015) and contended that the *Miller*-fix statute's remedy of release after twenty-five years corrected any error in the sentence. We disagreed that the possibility of early release rendered the sentence constitutional.

38

The United States Supreme Court in *Miller* declared that the Eighth Amendment requires sentencing courts to exercise their discretion at the time of sentencing itself, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 2468-72, 183 L. Ed. 2d 407 (2012); *Graham v. Florida*, 560 U.S. 48, 69-70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20, 391 P.3d 409 (2017). Parole and gain time generally do not satisfy the requirements of *Graham* and *Miller*, because neither avenue of early release is adequately based on a juvenile's demonstration of maturity and rehabilitation. *Johnson v. State*, 215 So.3d 1237, 1237 (Fla. 2017). Parole does not necessarily entail an individualized consideration of the juvenile offender's status at the time of the murder. *Atwell v. State*, 197 So.2d 1040, 1041 (Fla. 2016). One federal court noted that a state commission rarely granted petitions under one of the state's early release programs because of the heinous nature of the crime. *LeBlanc v. Mathena*, 841 F.3d 256, 274 (4th Cir. 2016) (Virginia's Criminal Sentencing Commission's application of the state geriatric lease program), *rev'd on other grounds Virginia v. LeBlanc*, ___ U.S. ___, 137 S. Ct. 1726, 198 L. Ed. 2d 186 (2017). The Iowa Supreme Court, in *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), declared unconstitutional, under its state's cruel and unusual punishment clause, a statute mandating a sentence of incarceration in a prison for juvenile offenders with no opportunity for parole until a minimum period of time. Mandatory minimum sentences are too punitive for what we know about juveniles.

*State v. Lyle*, 854 N.W.2d at 400. *Miller* implies that sentencing courts must always

consider the diminished capacity of juvenile offenders such that juvenile offenders should

never be sentenced to mandatory minimums.

I now turn to some specific questions raised by this appeal. I previously

mentioned a critical feature of this appeal—that being the resentencing court reimposing

of a 280-month sentence for nonaggravated first degree murder consecutive to the

sentence for aggravated first degree murder. The majority writes that RCW

10.95.030(3)(a)(i) does not require the reordering of other sentences from consecutive to

concurrent. According to the majority, reconsideration of sentences for crimes other than

aggravated first degree murder is not even part of a *Miller*-fix resentencing. If one

logically extended the majority's ruling, *Miller* and *Montgomery* do not preclude the

nonaggravated first degree murder conviction from carrying any sentence perhaps other

than life, and the two decisions do not prohibit the running of two sentences

consecutively beyond the life expectancy of the offender. This ruling by the majority

effectively holds that Jeremiah Gilbert's youth holds no relevance to combined

sentencing. The sentencing court could impose aggregate consecutive sentences of

infinity without violating *Miller*. The State advocates this ruling of the majority.

*State v. Ronquillo*, 190 Wn. App. 765, 361 P.3d 779 (2015) thwarts the majority's

position. Brian Ronquillo, at the age of sixteen in 1994, killed one and injured another

during a gang-motivated drive-by shooting. The jury convicted Ronquillo of first degree

40

murder, two counts of attempted first degree murder, and one count of second degree

assault while armed with a firearm. The sentencing court imposed consecutive sentences.

After *Miller*, the resentencing court refused to run sentences concurrently. The

consecutive sentences for the violent crimes led to a term exceeding fifty years. On

appeal, the State emphasized that Ronquillo was serving four separate sentences for

crimes against four different victims, not a single lengthy sentence for a single

conviction. According to the State, the Eighth Amendment did not implicate separate

sentences for separate crimes. We disagreed. This court reversed and remanded for

resentencing because the resentencing court erroneously concluded it lacked a legal basis

for an exceptional sentence.

The Washington Supreme Court also rejected the majority's ruling that Jeremiah

Gilbert's multiple crimes render the *Miller* principles inapplicable. In *State v. Ramos*,

187 Wn.2d 420 (2017), the state high court extended *Miller* to juveniles sentenced for

multiple homicides. The court explained:

> *Miller*'s reasoning clearly shows that it applies to *any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation.* . . .
> . . . [N]othing about *Miller* suggests its individualized sentencing requirement is limited to single homicides because "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." *Miller*, 132 S. Ct. at 2465 (emphasis added). . . .

187 Wn.2d at 438 (emphasis added).

The *Ramos* ruling follows the prevailing view in America. The majority of other jurisdictions have held that, at some point without uniform agreement as to when, aggregate sentences and parole ineligibility for juvenile offenders constitutes cruel and unusual punishment. *Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017); *McKinley v. Butler*, 809 F.3d 908, 909-11 (7th Cir. 2016); *Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013); *State v. Zuber*, 227 N.J. 422, 152 A.3d 197, 203, 215 (2017); *Willbanks v. Department of Corrections*, 522 S.W.3d 238, 244-45 (Mo. 2017); *State v. Moore*, 149 Ohio St. 3d 557, 76 N.E.3d 1127 (Ohio 2016), *petition for cert. filed*, No. 16-1167 (Mar. 22 2017); *State v. Boston*, 131 Nev. Adv. Op. 98, 363 P.3d 453 (2015); *Bear Cloud v. State*, 334 P.3d 132, 136, 141-42 (Wyo. 2014); *People v. Caballero*, 55 Cal. 4th 262, 282 P.3d 291 (2012). Terrance Graham's unconstitutional sentence resulted from multiple crimes. *Graham v. Florida*, 560 U.S. 48 (2010). To be consistent with the underlying principles and logic of *Roper*, *Graham*, *Miller*, and *Montgomery*, the characteristics of youth and the prospects for rehabilitation must be evaluated before a juvenile offender is condemned to a lifetime in prison, no matter whether the juvenile committed one offense or multiple offenses. *State v. Zuber*, 152 A.3d at 212. The force and logic of *Miller*'s concerns apply broadly and particularly to multiple offenses during a single criminal episode. *State v. Zuber*, 152 A.3d at 212. As the Indiana Supreme Court wrote, the court should "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count."

42

*Brown v. State*, 10 N.E.3d at 8 (Ind. 2014). Whether the sentence results from a discrete offense or multiple offenses, the fact remains that a juvenile, with diminished moral culpability, committed the one or several offenses. *State v. Moore*, 149 Ohio St. 3d 557, 76 N.E.3d 1127, 1142 (Ohio 2016).

Jeremiah Gilbert's resentencing court may have deemed it held authority to modify Gilbert's sentence only to the extent the original sentence imposed life without parole for the aggravated first degree murder. In other words, the trial court may have concluded it lacked power to modify the 280-months' concurrent sentence for nonaggravated first degree murder. *State v. Ramos* held otherwise.

In Washington, even if the offender is eighteen years to some unidentified age in his or her twenties, the sentencing court must consider the youth of the offender regardless of the standard range imposed by the Sentencing Reform Act. *State v. O'Dell*, 183 Wn.2d 680, 692 n.5, 358 P.3d 359 (2015). In such circumstances, the age of the offender can support an exceptional sentence below the standard range applicable to an adult felony defendant. *State v. O'Dell*, 183 Wn.2d at 698-99. Under *Ramos* and *Ronquillo*, this rule applies regardless of the number of crimes.

Most recently, in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), our Supreme Court addressed *Miller*'s applicability to juvenile defendants who received lengthy mandatory sentences attributable to firearm sentencing enhancements and thereby lacked the possibility of early release. The high court held that the Eighth

43

Amendment and *Miller* require that sentencing courts hold absolute discretion to depart

as far as desired below the otherwise applicable Sentencing Reform Act ranges and

sentencing enhancements when sentencing juveniles in adult court, regardless of how the

juvenile arrived in court.

The majority refuses to apply the teaching of *State v. Houston-Sconiers*. The

majority writes that Jeremiah Gilbert never raised an argument based on *Houston-*

*Sconiers* before the resentencing court, while the majority observes the obvious that the

Supreme Court issued *Houston-Sconiers* after Gilbert's resentencing hearing.

Nevertheless, Gilbert raised, with the superior court, an issue embedded in *Houston-*

*Sconiers*—that *Miller* requires the resentencing court to consider a sentence below the

standard range no matter the number of crimes in order to effectuate the *Miller* factors.

*Ronquillo* directly addressed this question. When an argument relates to the issues

addressed in the superior court, we may exercise our discretion to consider newly-

articulated theories for the first time on appeal. *Cave Properties v. City of Bainbridge*

*Island*, 199 Wn. App. 651, 662, 401 P.3d 327 (2017). Also, an appellate court possesses

inherent authority to consider issues that the parties have not raised if doing so is

necessary to a proper decision. *Falk v. Keene Corp.*, 113 Wn.2d 645, 659, 782 P.2d 974

(1989). If this court deemed further briefing necessary to dispose of questions arising

from *Houston-Sconiers*, we could have requested additional briefing. RAP 12.1(b). The

majority's directions to Jeremiah Gilbert to file a personal restraint petition thwarts

44

judicial economy and will enable the State to erect new barriers on the basis of personal restraint petition rules.

The parties agree that Jeremiah Gilbert will be sixty years old before he first might be released from the two consecutive sentences. Although the indeterminate sentence review board might not grant parole even at age sixty, Gilbert's punishment does not now necessarily equate to an actual life sentence. This court must still ask if the length of the sentence survives the constitutional strictures imposed by *Miller* and *Montgomery*. This question embraces the concept of a de facto life sentence.

No case has struck down a juvenile sentence as cruel and unusual when the perpetrator still has substantial life expectancy left at the time of eligibility for parole. *People v. Lozano*, 16 Cal. App. 5th 1286, 1291, 225 Cal. Rptr. 104 (2017). Nevertheless, most courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point. *Casiano v. Commissioner of Corrections*, 317 Conn. 52, 115 A.3d 1031, 1044 (2015). The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival and implicitly endorsed the notion that an individual is effectively incarcerated for life if he will have no opportunity to truly reenter society or have any meaningful life outside of prison. *Casiano v. Commissioner of Corrections*, 115 A.3d at 1047. The Supreme Court's *Miller* decision intended to allow juvenile offenders the opportunity to live a part of their lives in society, not simply to leave prison

in order to die. *State v. Moore*, 149 Ohio St. 3d 557, 76 N.E.3d 1127, 1137 (Ohio 2016).

Washington follows the majority view. In *State v. Ramos*, 187 Wn.2d 420 (2017), our high court wrote:

> [Similarly,] we also reject the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences. Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same.

*State v. Ramos*, 187 Wn.2d at 438-39.

In *Steilman v. Michael*, OP 16-0328, 2017 WL 6348119, at *5 (Mont. Dec. 13, 2017), the State of Montana argued against the existence of a de facto life sentence for purposes of *Miller* review. The State noted that no standard existed to determine how long a term of years must be before it becomes the equivalent of life imprisonment and that any term of years could be equivalent to life without parole if the offender dies while incarcerated. The Montana court rejected the argument as irrelevant.

A ruling that the cruel and unusual punishment clause bans a de facto life imprisonment for a rehabilitated juvenile offender does not end the inquiry. I must determine if the possibility of release at the earliest age sixty constitutes a de facto life sentence. Based on a consensus of other decisions, I conclude Gilbert's minimum forty-five-year sentence, with the first opportunity for release at age sixty, to be an

46

impermissible de facto life sentence.

In *People v. Hoy*, 2017 IL App.(1st) 142596, ___ N.E.3d ___ (2017), the court refused to vacate a sentence for fifty-two years' imprisonment for first degree murder when the offender would be age sixty-eight at the end of the term. The Illinois court did not consider the sentence to be one for life. Connecticut courts deem a one-hundred-year sentence to be a de facto life sentence, but not a thirty-one year term of incarceration. *State v. Riley*, 315 Conn. 637, 655-57, 110 A.3d 1205 (2015) (one hundred years); *State v. Logan*, 160 Conn. App. 282, 291-93, 125 A.3d 581 (2015) (thirty-one years).

In *State v. Ronquillo*, 190 Wn. App. 765, 361 P.3d 779 (2015), this court deemed a sentence that ran until the juvenile offender reached age sixty-eight to constitute a de facto life sentence. According to this court, the sentence impermissibly assessed Brian Ronquillo as virtually irredeemable. In *State v. Null,* 836 N.W.2d 41 (Iowa 2013), the midwestern court did not regard the juvenile's potential future release in his or her late sixties, after a half century of incarceration, sufficient to escape the rationales of *Graham* or *Miller.* In *Sam v. State*, 401 P.3d 834 (Wyo. 2017), the Wyoming high court ruled that a sentence imposed on Phillip Sam of a minimum fifty-two years with possible release at age seventy constituted a de facto life sentence. In *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132 (2014), the same western court adjudged a sentence of a minimum of forty-five years, with possible release at age sixty-one, as the functional equivalent of life without parole. In *State v. Williams-Bey*, 167 Conn. App. 744, 144 A.3d 467 (2016), the

court remanded for a new hearing a sentence that would not release a juvenile offender of murder until age fifty-two.

Court decisions fail to mention that incarceration decreases one's life expectancy. Michael Massoglia & William Alex Pridemore, *Incarceration and Health*, 41 ANN. REV. SOC. 291 (2015). According to a study conducted by Vanderbilt University and data from New York, for every year spent behind bars, overall life expectancy decreases two years. American Journal of Public Health, January 7, 2013; Nick Straley, Miller's *Promise: Re-Evaluating Extreme Criminal Sentences for Children*, 89 WASH. L. REV. 963, 986 n.142 (2014). This evidence suggests that a juvenile offender sentenced to a fifty-year term of imprisonment may never experience freedom. *Casiano v. Commissioner of Corrections*, 317 Conn. 52, 115 A.3d 1031, 1046 (2015).

In this appeal, the State also argues that *Miller* only prohibits a mandatory sentence for life without parole. The State further contends that *Miller* only demands that the sentencing court follow a process. The State implies that *Miller* only requires a hearing and created no substantive law to follow at the conclusion of the hearing. Our majority similarly continues to treat *Miller* as merely a process to follow and ignores the substantive requirements of *Miller* and *Montgomery*. Contrary to the State and the majority, *Miller* requires more than a procedural checkmark before imposing a sentence that would deny the juvenile offender a realistic opportunity of release in the offender's lifetime. *Budder v. Addison*, 851 F.3d 1047, 1055-56 (10th Cir. 2017); *Sam v. State*, 401

48

P.3d 834, 860 (Wyo. 2017). To repeat:

> The [*Miller*] hearing does not replace but rather gives effect to
> *Miller*'s substantive holding that life without parole is an excessive
> sentence for children whose crimes reflect transient immaturity.

*Montgomery v. Louisiana*, 136 S. Ct. at 736 (2016).

Under *Montgomery*, Jeremiah Gilbert's resentencing court's reviewing of records, entertaining of argument, and issuing a ruling does not satisfy constitutional strictures. If Jeremiah Gilbert's crime reflected transient immaturity or if Gilbert has been rehabilitated, the resentencing court must seriously consider releasing him, if not actually release him, now that he has served twenty-five years.

Regardless of whether we judge the crime at the time of its commission or we judge the person of Jeremiah Gilbert at the time of resentencing, Gilbert deserves a lighter sentence. The heinous nature of Gilbert's crimes does not necessarily equate to the crimes reflecting irreparable corruption. All evidence before the court pointed to Jeremiah Gilbert being a typical juvenile offender at the time of the murders. His running away from home reflected immaturity. The probation report at the time of the declination hearing concluded that Gilbert, like other immature teenagers, panicked when the hunter returned and confronted him for attempting to steal his truck. The murders resulted from the continuing panic. The 1992 report also noted that Gilbert lacked sophistication and maturity and that he lacked the ability to process information and make decisions as an adult. Gilbert's slaying of his first murder victim as the victim lay helpless is particularly

49

gruesome, but also reflected panic by Gilbert. Dr. Ronald Roesch, appointed by the court for the resentencing hearing, agrees with the 1992 report.

No testimony before the resentencing court established that the crimes reflected irretrievable depravity or irretrievable corruption. No testimony established that Jeremiah Gilbert was irredeemable in 1992 or in 2016. Gilbert is not one of the rarest of juvenile offenders. The only testimony as to Jeremiah Gilbert's presentation today is that of rehabilitation. Assuming Jeremiah Gilbert carried the burden of proof as to his transient immaturity at the time of the crimes or his rehabilitation at the time of the resentencing hearing, Gilbert met this burden by the undisputed evidence. Assuming the State carried the burden of proving irretrievably depravity, the State presented no evidence to meet the standard.

The required *Miller* hearing is not an ordinary sentencing proceeding. *State v. Ramos*, 187 Wn.2d at 443 (2017). *Miller* establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered. *State v. Ramos*, 187 Wn.2d at 443; *Aiken v. Byars*, 410 S.C. 534, 543, 765 S.E.2d 572 (2014). Therefore, a court conducting a *Miller* hearing must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified. *State v. Ramos*, 187 Wn.2d 187 at 443. The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified

by the *Miller* Court and how those differences apply to the case presented. *State v. Ramos*, 187 Wn.2d at 444. While formal written findings of fact and conclusions of law are not strictly required, they are always preferable to ensure that the relevant considerations have been made and to facilitate appellate review. *State v. Ramos*, 187 Wn.2d at 444.

One state court has held that the sentencing court must enter a specific finding of permanent incorrigibility before imposing a sentence of life without parole. *State v. Veal*, 298 Ga. 691, 784 S.E.2d 403, 412 (2016). Another court has directed sentencing courts to make findings as to why it deviated from the general rule that juvenile offenders must be treated differently. *State v. Null*, 836 N.W.2d 41, 75 (Iowa 2013). In *Crawford v. Pearson*, 2017 WL 3783637, ___ F.Supp.3d ___, (E.D. Va. 2017), the federal district court granted the prisoner's habeas corpus petition because the sentencing court failed to find the prisoner to be incorrigible or to pose a threat such that a life sentence without parole was justified.

The State contends that the resentencing court must have considered Jeremiah Gilbert's youth before resentencing since the court mentioned it read Ronald Roesch's report. I disagree. The resentencing court may have read the report, but it never reflected on the report's implications. In its ruling, the resentencing court focused on the viability of the consecutive sentences and the heinous nature of the crime. Nevertheless, *Miller* posits a central intuition—that children who commit even heinous crimes are capable of

51

change. *Montgomery v. Louisiana*, 136 S. Ct. at 736 (2016). *Miller* applied its own

principles to a botched robbery that turned into a killing. *Miller v. Alabama*, 567 U.S. at

473 (2012).

Jeremiah Gilbert's meditation about killing before he fired his fatal shots does not

merit a de facto life sentence. A finding that the juvenile offender committed murder

deliberately and with premeditation means little when determining whether the crime

resulted from transient immaturity. *Commonwealth v. Batts*, 163 A.3d at 437. Such a

finding would require an imposition of life without parole on any juvenile offender

convicted of first degree murder.

In its ruling, the resentencing court declared that it accepted the State's argument

in total. The State's argument was that because of the nature of the crimes and the

multiplicity of the crimes Jeremiah Gilbert deserved life without parole. The State took

the position that youth was immaterial. The State never asserted that Gilbert was

irretrievably depraved. To the contrary, the State reluctantly agreed that Gilbert has

performed well in prison during the last nine years. The State submitted no evidence that

Gilbert was not rehabilitated.

Even if the resentencing court considered the *Miller* factors before resentencing

Jeremiah Gilbert, the resentence fails constitutional muster. The resentencing court

would have thereby followed the *Miller* procedure, but failed to implement the

substantive holding of *Miller v. Alabama*. The undisputed evidence established Jeremiah

Gilbert's crimes reflected transient immaturity and that Gilbert is rehabilitated. This undisputed evidence demands release of Gilbert from incarceration before age sixty. The United States Supreme Court has not devoted pages of discussion of the attributes of youth for naught. If Jeremiah Gilbert can receive a de facto life sentence, then any juvenile convicted of aggravated first degree murder may face a life sentence and *Mille*r becomes void.

In the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. *Commonwealth v. Batts*, 163 A.3d 410, 435 (Pa. 2017); *Commonwealth v. Coia*, 2017 PA Super. 250, 168 A.3d 219 (Pa. Super. Ct. 2017). For this reason, an appeals court should review de novo whether a juvenile offender is eligible for life without parole. *Commonwealth v. Batts*, 163 A.3d at 435. By case law extension, this rule applies to de facto life sentences.

On appeal, the State argues that Jeremiah Gilbert can prevail on his claim of cruel and unusual punishment only by establishing the *Fain* factors. The State also implies that Gilbert carries the burden of establishing the *Fain* factors to gain an earlier release. In *State v. Fain*, 94 Wn.2d 387, 392-93, 617 P.2d 720 (1980), the Washington Supreme Court announced four factors when determining if a sentence violates the Washington constitutional prohibition against cruel and unusual punishment. The State fails to

53

recognize that the *Fain* factors lack relevance based on *Miller*. Under *Miller*, the critical, if not only, question is whether the offender is irretrievably depraved.

The State continues to forward *State v. Cornejo*, 130 Wn.2d 553, 569-70, 925 P.2d 964 (1996) for the proposition that juveniles are not less blameworthy because they are just as capable of making reasoned decisions. The Washington Supreme Court decided *Cornejo* years before *Graham*, *Miller*, and *Montgomery*. The state Supreme Court issued the opinion before the publishing of scientific literature concerning the mental and emotional immaturity of youth and young adults.

I recognize that some of my analysis conflicts with the Washington Supreme Court's decision in *State v. Ramos*, 187 Wn.2d 420 (2017). Nevertheless, I am bound by United States Supreme Court decisions, not Washington Supreme Court decisions, with regard to federal constitutional questions. *Chesapeake & Ohio Railway Co. v. Martin*, 283 U.S. 209, 221, 51 S. Ct. 453, 75 L. Ed. 983 (1931).

### *Bassett* and *Sweet*

This dissenting opinion has previously identified incongruities in the *Miller* and *Montgomery* decisions. Because of these anomalies within the important setting of juvenile punishment, two state courts have declared any life without parole sentence for a juvenile offender does not meet muster under the states' respective constitutions. *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017); *State v. Sweet*, 879 N.W.2d 811, 835 (Iowa 2016). Presumably these rulings would apply to de facto life sentence or a life

sentence with uncertain parole. Under these holdings, the resentencing court need not even consider the transient immaturity or irreparable corruption of the juvenile offender before rejecting a life sentence. Based on this premise, this court, in *Bassett*, held Washington's *Miller*-fix statute to be unconstitutional.

*State v. Bassett* addressed an offender who committed his murder at age sixteen. Therefore, the decision addressed the constitutionality of RCW 10.95.030(3)(a)(ii). Jeremiah Gilbert's appeal entails RCW 10.95.030(3)(a)(i), not (ii). Nevertheless, the same reasoning behind the unconstitutionality of the statute implicates both subsections of the statute.

Division Two of this court issued *State v. Bassett*. The majority ignores the decision. Because of the *Bassett* decision's recent issuance, the parties never addressed *Bassett*, and this panel never asked the parties to address the decision.

The *Bassett* court based its decision on article I, section 14 of the Washington State Constitution, not the federal constitution's Eighth Amendment. The Washington provision reads similarly to the Eighth Amendment and declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." State constitutional protections may be more stringent than federal constitutional protections. *State v. Bassett*, 198 Wn. App. at 728. Washington law holds that Washington's cruel and unusual punishment clause provides greater protection than its federal counterpart. *State v. Ramos*, 187 Wn.2d at 453-54 (2017); *State v. Roberts*,

55

142 Wn.2d 471, 506, 14 P.3d 713 (2000). Perhaps the state constitution adds protections because the state provision extends to cruel and unusual punishment regardless of whether the punishment is unusual.

In *State v. Bassett*, Brian Bassett challenged the constitutionality of Washington's *Miller*-fix statute, RCW 10.95.030. The State advocated the validity of the statute under the *Fain* factors used by Washington courts to determine the validity of sentencing statutes under the Washington Constitution. The four *Fain* factors are (1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction. *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014). The *Bassett* court rejected the State's argument and instead applied a categorical bar analysis. In so ruling, this court adopted wholesale the reasoning of the Iowa Supreme Court in *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016).

*Miller* and *Montgomery* established that life without parole sentences for juvenile offenders are not available under the federal constitution even for heinous crimes except in very rare cases. The *Bassett* court, therefore, asked if, under the state constitution, we should continue to reserve the possibility that a juvenile offender may be identified as "irretrievable" at the time of sentencing or by the parole board at a later time after the offender's juvenile brain has fully developed and a behavior pattern established by a substantial period of incarceration. After answering the question, this court held that all

life without parole sentences for juvenile offenders offend the state constitution. The

*Bassett* court thereby refused to continue a narrower, more incremental approach of

addressing whether an offender is one of the extremely rare, irredeemably corrupt

juveniles.

The *Bassett* court considered the current status of state law and noted that, as of

February 2017, nineteen states and the District of Columbia had banned all juvenile life

without parole sentences. A geography buff will readily note that nineteen states and the

District of Columbia do not constitute a majority of United States jurisdictions.

Nevertheless, as observed in *Bassett*, in determining cruel punishment, the trend, by both

court decision and legislation, is to ban juvenile life without parole. The *Bassett* court

emphasized that the United States stands alone as the only nation to allow juveniles to

serve life in prison without parole.

The *Bassett* court turned the *Miller* decision on itself. The *Bassett* court took the

*Miller* holding and questioned how resentencing courts could implement the holding.

The court comprehended, as did the Iowa high court in *Sweet*, the speculative nature of

identifying which juvenile offenders are irretrievable at the time of trial. *Miller* asks the

sentencer to execute the impossible. Even expert psychologists encounter difficulty in

differentiating between the juvenile offender whose crime reflects unfortunate yet

transient immaturity, and the rare juvenile offender whose crime reflects irreparable

corruption. The acknowledgement by the *Bassett* court of this impossibility led to a

fundamental problem with the *Miller*-fix statute—the sentencing court cannot predict from its application of the *Miller* factors which juveniles will prove to be irretrievably corrupt. Thus, the *Miller*-fix statute results in an unacceptable risk that juvenile offenders, whose crimes reflect transient immaturity, will be sentenced to life without parole because the sentencing court mistakenly identifies the juvenile as one of the uncommon, irretrievably corrupt juveniles. The *Bassett* court, perhaps rightly so, grounds its analysis on the assumption that the sentencing court determines whether the juvenile offender is irreparably corrupt rather than deciding whether the crime committed shows irreparable corruption as directed by *Miller* and *Montgomery*. The *Bassett* court omits from its astute analysis the difficulty the resentencing court or the indeterminate sentence review board encounters when it, twenty-five years after the crime, decides whether the crime reflected irretrievable depravity.

According to the *Bassett* court, the sentencing court's task grows more difficult under Washington law because Washington's cruel punishment clause provides greater protection than its federal counterpart. Under federal law, life without parole sentences for juvenile homicide offenders are to be uncommon and rare. Thus, to comport with Washington's broader protections, life without parole or early release sentences may be imposed on only the *most* uncommon and *rarest* of offenders, an impossible determination for the sentencing court to make when faced with a juvenile offender. The factors identified in *Miller* provide little guidance for a sentencing court and do not

alleviate the unacceptable risk identified.

The *Bassett* court quoted a passage from *State v. Sweet* in illustrating the

impossibility of applying the *Miller* factors:

> [Consideration of] the offender's family and home environment . . .
> is . . . fraught with risks. For example, what significance should a
> sentencing court attach to a juvenile offender's stable home environment?
> Would the fact that the adolescent offender failed to benefit from a
> comparatively positive home environment suggest he or she is irreparable
> and an unlikely candidate for rehabilitation? Or conversely, would the
> offender's experience with a stable home environment suggest that his or
> her character and personality have not been irreparably damaged and
> prospects for rehabilitation are therefore greater? . . .
> A similar quandary faces courts sentencing juvenile offenders who
> have experienced horrendous abuse and neglect or otherwise have been
> deprived of a stable home environment. Should the offenders' resulting
> profound character deficits and deep-seated wounds count against the
> prospects for rehabilitation and in favor of life-without-the-possibility-of-
> parole sentences under the *Miller* framework? Or should sentencing courts
> view the deprivation of a stable home environment as a contraindication for
> life without the possibility of parole because only time will tell whether
> maturation will come with age and treatment in a structured environment?

*Sweet*, 879 N.W.2d at 838.

The *Bassett* court concluded that, in light of the speculative and uncertain nature

of the *Miller* analysis, the *Miller*-fix statute creates a risk of misidentifying juveniles with

hope of rehabilitation for those who are irretrievably corrupt. The State's cruel

punishment proscription deems this risk unacceptable. Existing state laws, allowing the

imposition of these sentences based only on a discretionary, subjective judgment by a

judge or jury that the offender is irredeemably depraved, cannot prevent the possibility

that the offender will receive a life without parole sentence for which he or she lacks the moral culpability. Courts taking a case-by-case proportionality approach also cannot with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change. Therefore, life sentences without parole or early release for juvenile offenders as allowed under RCW 10.95.030(3)(a)(ii) are unconstitutional. This court reversed Brian Bassett's life without parole sentence and remanded for resentencing consistent with the opinion.

The reader may ask what should the *Bassett* resentencing court do under this court's decision. Presumably the lower court cannot impose a maximum sentence of life as demanded by the *Miller*-fix statute. Instead, the court must impose a maximum sentence that allows the offender release from prison at some indefinite time in the future. Presumably the sentencing court must allow the juvenile offender into society at least for his or her geriatric years. Presumably the sentencing court may not defer to the indeterminate sentence review board to determine the offender's release date.

The *Bassett* court may base its decision, in part, on the proposition that, if a court faces an impossible task, the statute that directs that impossible task must be unconstitutional. No principle of law demands that a statute that creates an impossible task be declared unconstitutional. The statute may remain constitutional but not enforced because of its impossibility of enforcement. The *Bassett* court wisely grounds its decision on the firmer basis that a sentencing scheme must be capable of fair application

60

or it violates the cruel punishment clause.

I conclude that the *Miller*-fix statute places a difficult, if not impossible, burden on the sentencing and resentencing courts for another reason. State judges undergo election. The electorate expects a harsh sentence on a multiple murderer. The electorate considers the freeing of a murderer as deprecating the seriousness of the reprehensible crime. Grieving victim relatives demand justice and shun release of a coldblooded murderer no long how much time has passed. Even after *Miller* and the instruction to impose life sentences only on the rarest of offenders who are irretrievably depraved, juvenile offenders continue to receive life without parole in the form of de facto life sentences without any evidence of irretrievable corruption and with all recent evidence indisputably showing rehabilitation. Jeremiah Gilbert's appeal is one such case. Joel Ramos' case is another.

In *Roper v. Simmons*, 543 U.S. 551 (2005), the nation's high Court, in a death penalty case, rejected the argument that the Eighth Amendment required only that juries be told they must consider the defendant's age as a mitigating factor before electing whether or not to impose the ultimate penalty. The Court concluded that an "unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Roper v. Simmons*, 543 U.S.

61

at 573. This same danger looms when an elected judge, with the authority to impose a lengthy sentence that effectively becomes a life sentence, sentences or resentences a juvenile homicide offender.

I join in Division Two's *Bassett* ruling. I would declare the *Miller*-fix statute unconstitutional. The Washington Supreme Court has accepted review of *Bassett* and will make the final decision based on the state constitution.

The ultimate value behind the United States Constitution's Eighth Amendment cruel and unusual punishment clause is the affirmation of the dignity of humankind. *Roper v. Simmons*, 543 U.S. at 560 (2005); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958). The state must accept the human attributes even of those who commit serious crimes. *Graham v. Florida*, 560 U.S. at 59 (2010). Jeremiah Gilbert, as an immature runaway, disrespected the dignity of man and the value of life. Society, nonetheless, need not retaliate against Gilbert by disrespecting his dignity and devaluing his life. Gilbert, with the help of the state corrections system and through his own maturation, has rehabilitated himself.

This court should affirm and respect life by allowing Jeremiah Gilbert release from prison and permit him to exist as a human being free from constant restraints and ceaseless monitoring. We should grant Jeremiah Gilbert the opportunity to fulfill his humanity with his daily choosing from possible paths and courses of conduct. Release of Jeremiah Gilbert does not denigrate the lives or belittle the losses of life of Gilbert's

victims, but rather venerates the sanctity of all human life.  With the undisputed record before this court, I hold confidence that Gilbert will contribute to the welfare of others with his release from incarceration.  The Washington criminal justice system and the Washington populace will then benefit from mercy shown Jeremiah Gilbert.  The State of Washington will also have finally fulfilled the letter and spirit of *Miller v. Alabama*.

I respectfully dissent

_____
Fearing, J.

Appendix A
RCW 10.95.030

(1) Except as provided in subsections (2) and (3) of this section, any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole. A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer and the indeterminate sentence review board or its successor may not parole such prisoner nor reduce the period of confinement in any manner whatsoever including but not limited to any sort of good-time calculation. The department of social and health services or its successor or any executive official may not permit such prisoner to participate in any sort of release or furlough program.

. . . .

(3)(a)(i) Any person convicted of the crime of aggravated first degree murder for an offense committed prior to the person's sixteenth birthday shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of twenty-five years.

(ii) Any person convicted of the crime of aggravated first degree murder for an offense committed when the person is at least sixteen years old but less than eighteen years old shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of no less than twenty-five years. A minimum term of life may be imposed, in which case the person will be ineligible for parole or early release.

(b) In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

(c) . . . During the minimum term of total confinement, the person shall not be eligible for community custody, earned release time, furlough, home detention, partial confinement, work crew, work release, or any other form of early release authorized under RCW 9.94A.728, or any other form of authorized leave of absence from the correctional facility while not in the direct custody of a corrections officer. . . .

. . . .

64

(f) No later than one hundred eighty days prior to the expiration of the person's minimum term, the department of corrections shall conduct, and the offender shall participate in, an examination of the person, incorporating methodologies that are recognized by experts in the prediction of dangerousness, and including a prediction of the probability that the person will engage in future criminal behavior if released on conditions to be set by the board. The board may consider a person's failure to participate in an evaluation under this subsection in determining whether to release the person. The board shall order the person released, under such affirmative and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released. If the board does not order the person released, the board shall set a new minimum term not to exceed five additional years. The board shall give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release.

(g) In a hearing conducted under (f) of this subsection, the board shall provide opportunities for victims and survivors of victims of any crimes for which the offender has been convicted to present statements as set forth in RCW 7.69.032. The procedures for victim and survivor of victim input shall be provided by rule. To facilitate victim and survivor of victim involvement, county prosecutor's offices shall ensure that any victim impact statements and known contact information for victims of record and survivors of victims are forwarded as part of the judgment and sentence.

(h) An offender released by the board is subject to the supervision of the department of corrections for a period of time to be determined by the board. The department shall monitor the offender's compliance with conditions of community custody imposed by the court or board and promptly report any violations to the board. Any violation of conditions of community custody established or modified by the board are subject to the provisions of RCW 9.95.425 through 9.95.440.

(i) An offender released or discharged under this section may be returned to the institution at the discretion of the board if the offender is found to have violated a condition of community custody. The offender is entitled to a hearing pursuant to RCW 9.95.435. The board shall set a new minimum term of incarceration not to exceed five years.

Appendix B
Jeff Coats Remarks during Resentencing Hearing

The best way for me to start this is by expressing how I know Jeremiah.

I know Jeremiah because I went to the adult prison system when I was fourteen years old and I did seventeen years in it. Today I speak at universities, detention centers, inside prisons and the Legislature about incarceration, change and transition. I also work as a real estate agent and own my own business.

While I was incarcerated I lived around Jeremiah in the same unit with him day after day, hour after hour. I've known Jeremiah for about twenty-one years.

I traveled down here from Seattle today because it is important for me to give you a verbal glimpse as to who Jeremiah is today, even though you're sentencing him based off something that happened long ago.

He is a humble person. He is a friendly person. He is a man of integrity and morals, something that he may not have had at fifteen years-old. He is a loving person and most importantly he is not the same man at thirty-eight as he was when he was fifteen years-old. Today he is a mentor to not just the youth of the system; but to every man in the system. He tries to be a positive individual who promotes being humble for what you have and to work hard for everything in life. He's not bitter and he has accepted his responsibility for his actions that day.

He has moved forward with his life towards being a productive, positive individual and has dedicated his life to helping others and to giving back.

. . . .

Before I talk any more about Jeremiah, let's talk about the victims and the justice for them, because that's important. When I thought about this I thought is there ever really justice for any victim? Every crime has a victim no matter how small or how heinous. We as a society try to judge and determine what the appropriate punishment should be for said crimes to give the victim justice, or in this case, the victims justice and to teach the perpetrator a lesson in hopes of reforming. Then we try and rely on our judges like yourself to find the balance and create the appropriate sentence.

Right now juveniles sentenced to life in prison would do more or double the amount of time as an adult male does for a similar crime. This state does not have parole or a review period for parole until recently for

66

the juveniles that are sentenced.

So a life sentence given doesn't allow for much of a chance for relief for a juvenile whose mind develops in prison. Maturity takes place in prison and grows -- and they grow into men like Jeremiah is here today. Jeremiah has done twenty years already -- twenty-three.

If he does any more time than this he will be doing more time than the equivalent and a lot more time than most men who are convicted of multiple murders in our state. I only speak that because I've seen it. The law books that were mentioned earlier give a bigger range for a sentence; but the men who are sentenced usually get less time than what the book outlines, as I'm sure you see here in your own courtroom.

Remember when you are sentencing Jeremiah today that you are sentencing a fifteen-year-old boy, not the man that's standing here. I know that's hard to do or hard to think about; but he was a young boy at the time of this crime. And the question then is by giving a twenty-five-year sentence, is this justice for the victims and is this an equal balance of punishment.

I feel that if you sentence Jeremiah to twenty-five years, running everything concurrent, with his time served you are, in fact, giving justice to the victims. You would bring balance to what was once an unbalanced punishment by giving an individual who was fifteen years old, a juvenile boy when this crime was committed, not the grown man that you see before you; but a skinny young kid at fifteen, with an undeveloped mind and an undeveloped maturity, a sentence that would be fair and just. The time he has done already is more than two lifetimes.

To conclude, I respectfully ask that you use the State's growth of the past -- over the past ten years when it comes to juveniles and how we sentence them to guide you in your sentencing of Jeremiah. He doesn't deserve to live a life in prison longer than twenty-five years today. He made a horrible, horrible mistake, that's not in question here, at a very young age. And he has accepted that responsibility and he has spent many years giving back to the community from behind prison fences, a feat that shouldn't be overlooked.

At the very low end of what you're allowed to give as a sentence, you indeed will be giving justice to the victims. And I hope that you find it in your heart to hear those of us who know who Jeremiah is today, and give that lower sentence when you sentence Jeremiah today.

RP at 13-17.

67

Appendix C
Tactics Employed to Avoid *Miller*

1. The legislature, not the courts, holds the prerogative to set the length of sentences. *Cook v. State*, --- So.3d ---, 2017 WL 3424877 (Miss. Ct. App. 2017).

2. American law must be based on American, not international, values, even if the United States is an outlier. State argument in *State v. Sweet*, 879 N.W.2d 811, 818 (Iowa 2016).

3. The United States Supreme Court has not imposed a categorical bar of the penalty of life in prison without parole. States's argument in this appeal; *Garcia v. State*, 903 N.W.2d 503, 508 (N.D. 2017); *Newton v. State*, 83 N.E.3d 726, 744 (Ind. Ct. App. 2017).

4. *Miller v. Alabama* only barred the mandatory nature of life without parole for juvenile offenders, and not the punishment itself. *In Re Personal Restraint of McNeil*, 181 Wn.2d 582, 554, 334 P.3d 548 (2014); *Bun v. State*, 296 Ga. 549, 769 S.E.2d 381, 384 (2015); *Hobbs v. Turner*, 2014 Ark. 19, 431 S.W.3d 283, 285, 289 (2014); *State v. Arredondo*, 406 S.W.3d 300, 306 (Ct. App. Tex. 2013).

5. Graham and *Miller* apply only when the sentencing court sentences the juvenile offender to the specific sentence of life without parole for one offense. *Lucero v. People*, 2017 CO 49, 394 P.3d 1128, 1132 (Colo. 2017).

6. Because *Miller* only banned mandatory life without parole sentences for juvenile offenders and thus a sentencing court may always on a discretionary basis impose a life without parole sentence regardless of the immaturity of the offender at the time of the homicide or the extent of the offender's rehabilitation. *People v. Holman*, 2017 IL 12065, --- N.E.3d --- (2017); Conley v. State, 972 N.E.2d 864, 879 (Ind.2012).

7. Because of the nature of the crime, the offender must possess an explosive personality that demands life in prison. "He is the type of individual who is likely to blow at any point." *Garcia v. State*, 903 N.W.2d 503, 510 (N.D. 2017).

8. The offender's crimes were premeditated, calculated acts, and no evidence demonstrates an acceptable explanation or excuse for the crimes. The planning of the crime shows a lack of impetuosity. State argument in *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017); *Cook v. State*, --- So.3d ---, 2017 WL 3424877 (Miss. Ct. App. 2017).

9. The brutality of the crimes outweighs any rehabilitation achieved by the offender. State argument in *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017) and in this appeal.

10. A person who commits a heinous crime is beyond rehabilitation. Commonwealth argument in *Commonwealth v. Batts*, 163 A.3d 410, 435 (Pa. 2017); *Newton v. State*, 83 N.E.3d 726, 743 (Ind. Ct. App. 2017).

11. The crime was heinous, shocking, incomprehensible, extraordinary,

69

unthinkable, cold, heartless, and uncivilized. *Bell v. Uribe*, 748 F.3d 857, 869-70 (9th

Cir. 2014); Conley v. State, 972 N.E.2d 864, 879 (Ind.2012). With this argument, the

sentencing court focuses on the nature of the crime and the crime's incorrigibility, rather

than the offender's incorrigibility.

12. Few murders reflect only transient immaturity. The term "transient

immaturity" effectively absolves the offender of culpability. *Cook v. State*, --- So.3d ---,

2017 WL 3424877 (Miss. Ct. App. 2017).

13. The United States Supreme Court has never defined irretrievably corrupt, a

term that sounds more like a theological concept than a rule of law to be applied by an

earthly judge. The United States Supreme Court has given the sentencing court or

resentencing court a difficult, if not impossible, task. Therefore, we will defer to the

resentencing court's reimposition of life without parole. *Cook v. State*, --- So.3d ---, 2017

WL 3424877 (Miss. Ct. App. 2017).

14. Irretrievably depraved offenders are only "allegedly" rare. *Cook v. State*, ---

So.3d ---, 2017 WL 3424877 (Miss. Ct. App. 2017).

15. Retribution and deterrence remain proper purposes of sentencing. *Cook v.*

*State*, --- So.3d ---, 2017 WL 3424877 (Miss. Ct. App. 2017).

16. The devastating impact of the crime on the victim's family warrants a

sentence of life in prison without the possibility of parole. *Bell v. Uribe*, 748 F.3d 857,

870 (9th Cir. 2014).

17.  *Miller* applies to literal life without parole sentences but not to de facto life without parole sentences.  *State v. Ramos*, 189 Wn. App. 431, 451–52 (2015), *aff'd but disagreed with on this ground,* 187 Wn.2d 420 (2017); sentencing court in *State v. Ronquillo*, 190 Wn. App. 765, 775 (2015).

18.  *Miller* does not apply to a sentence that involves a term of years.  *State argument in State v. Ronquillo*, *190 Wn. App. 765, 768 (2015); Henry* v. State, 82 So.3d 1084, 1089 (Fla.Ct.App.2012); *State v. Kasic*, 228 Ariz. 228, 265 P.3d 410, 415 (App.2011).

19.  *Miller* only mandates that a procedure be followed.  Under that procedure the sentencing court must consider the youthfulness of the offender at the time of the crime, but *Miller* does not mandate any particular substantive outcome.  As long as the sentencing court follows the procedure, the court retains the discretion to resentence the offender to life without parole.  *Bell v. Uribe*, 748 F.3d 857, 870 (9th Cir. 2014); *People v. Holman*, 2017 IL 12065, --- N.E.3d --- (2017); *In re Petition of Wolf*, 196 Wn. App. 496, 596, 384 P.3d 591 (2016).

20.  *Miller* and *Montgomery* did not address juvenile offenders who were sentenced to multiple fixed-term periods of imprisonment for multiple offenses.  Therefore, the sentencing court may impose a de facto life sentence for multiple crimes even if all crimes occurred at the same time.  Our majority; *Willbanks v. Department of Corrections,* 522 S.W.3d 238, 242 (Mo. 2017); *State v. Ali*, 895 N.W.2d 237, 242 (Minn.

71

2017); McCullough v. State, 233 Md. App. 702, 168 A.3d 1045 (2017); *State v. Arredondo*, 406 S.W.3d 300, 306 (Ct. App. Tex. 2013).

21. Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes. *State v. Ali*, 895 N.W.2d 237, 242 (Minn.2017); *State v. Buchold*, 727 N.W.2d 816, 823-36 (S.D.2007).

22. *Miller* does not apply to sentences resulting from aggregate consecutive sentences for multiple homicides. *State v. Ramos*, 189 Wn. App. at 451-52 (2015), *aff'd but disagreed with on this ground*, 187 Wn.2d 420 (2017); *Lucero v. People*, 2017 CO 49, 394 P.3d 1128 (Colo.2017); sentencing court in *State v. Ronquillo*, 190 Wn. App. at 775 (2015).

23. No standard exists to determine how long a term-of-years must be before it becomes the equivalent of life imprisonment, and any term-of-years could be equivalent to life without parole if the offender dies while incarcerated. State argument in *Steilman v. Michael*, OP 16-0328, 2017 WL 6348119, at *5 (Mont. Dec. 13, 2017)

24. In Washington, the sentencing court considers the *Fain* factors, rather than any categorical bar against life without parole or rather than looking to the immaturity of the offender. State's position in this appeal.

25. The United States Supreme Court does not require that the resentencing court enter a finding of fact of irretrievably depravity. The sentencer is not required to use the words "incorrigible" or "irretrievably corruption" in his or her ruling. Since the

resentencing court reviewed all of the evidence presented to it by the offender and the State, the resentencing court must have considered the youthfulness of the offender at the time of the crime and all other *Miller* factors, but nonetheless found the offender to be one of the rare irretrievably depraved people who can never be rehabilitated and trusted in society, no matter what oral ruling the resentencing court uttered. State's position in this appeal; *State v. Ramos*, 187 Wn.2d at 437 (2017); *People v. Holman*, 2017 IL 12065, --- N.E.3d --- (2017); *Garcia v. State*, 903 N.W.2d 503, 512 (N.D. 2017).

26. The juvenile offender carries the burden of proving transient immaturity rather than the State proving irreparable corruption. *State v. Ramos*, 187 Wn.2d 420 (2017); State argument in *Commonwealth v. Batts*, 163 A.3d 410, 434 (Pa. 2017).

27. An appellate court reviews the resentencing court's decision under *Miller* only for an abuse of discretion. State argument in *Commonwealth v. Batts*, 163 A.3d 410, 434 (Pa. 2017); *Hudspeth v. State*, 179 So.3d 1226, 1228 (Miss. Ct. App. 2015).

28. There is no presumption against a sentence of life without parole. *Jones v. State*, 122 So.3d 698, 702 (Miss. 2013).

29. Even if the sentencing hearing occurred before the *Miller* decision, no resentencing is needed if the sentencing court mentioned the youth of the offender in his sentencing ruling. *Garcia v. State*, 903 N.W.2d 503 (N.D. 2017); *Windom v. State*, 162 Idaho 417, 398 P.3d 150, 157–58 (2017); *Johnson v. State*, 162 Idaho 213, 395 P.3d 1246 (2017).

30. If the offender is close to his eighteenth birthday, his youth should not weigh against the imposition of a sentence of life without parole. *Cook v. State*, --- So.3d ---, 2017 WL 3424877 (Miss. Ct. App. 2017).

31. The State sentencing scheme allowed a juvenile offender the opportunity to present mitigating evidence at a hearing, but the offender agreed to the sentence of life without parole through a plea bargain, even if sentencing occurred before *Miller* and the offender entered the plea to avoid a death sentence. *Jones v. Commonwealth*, 293 Va. 29, 795 S.E.2d 705, 713 (2017); *Newton v. State*, 83 N.E.3d 726, 739 (Ind. Ct. App. 2017).

32. A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. *State v. Rivera*, 177 Conn. App. 242, 172 A.3d 260, 271 (2017).

33. The life sentence need not be reversed because a new statute known as the "*Miller* fix" provides a possibility of early release. State argument in *State v. Ronquillo*, 190 Wn. App. 765, 777–79 (2015).

34. The amount of good time credit to which the offender is eligible may reduce the sentence below a de facto lifetime sentence. *Steilman v. Michael*, OP 16-0328, 2017 WL 6348119, at *5 (Mont. Dec. 13, 2017).

35. A commutation by the state governor to a sixty-year sentence without the possibility of parole complies with *Miller*. State argument in *State v. Ragland*, 836 N.W.2d 107, 110 (2013).

74

36.  Access to a parole board satisfies the mandates of *Miller.  State v. Calhoun*, 222 So.3d 903, 907 (La. App. 2 Cir. 2017).

Appendix D
Terms Used for an Offender Who May Receive Life without Parole

Crimes reflect permanent incorrigibility.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 726, 734, 193 L. Ed. 2d 599 (2016); *State v. Bassett*, 198 Wn. App. 714, 725, 394 P.3d 430 (2017).

The crime exhibits such irretrievably depravity that rehabilitation is impossible. *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 733, 193 L. Ed. 2d 599 (2016).

Few incorrigible juvenile offenders.  *Graham v. Florida*, 560 U.S. 48, 77, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. Bassett*, 198 Wn. App. 714, 723, 394 P.3d 430 (2017).

Forever incorrigible.  *Commonwealth v. Batts*, 163 A.3d 410, 435 (Pa. 2017); *Newton v. State*, 83 N.E.3d 726, 739 (Ind. Ct. App. 2017).

Incapable of rehabilitation.  *Commonwealth v. Batts*, 163 A.3d 410, 416 (Pa. 2017).

Incorrigible.  *Graham v. Florida*, 560 U.S. 48, 72-73, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2465, 183 L. Ed. 2d 407 (2012).

Irredeemable.  *Graham v. Florida*, 560 U.S. 48, 75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Sam v. State*, 401 P.3d 834, 859 (Wyo. 2017).

Irreparable corruption.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016); *Miller v. Alabama*, 567 U.S. 460, 479-80, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Graham v. Florida*, 560 U.S. 48, 73, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. Ramos*, 187 Wn.2d 420, 437, 387 P.3d 650 (2017); *Commonwealth v. Batts*, 163 A.3d 410, 416 (Pa. 2017); *Garcia v. State*, 903 N.W.2d 503, 508 (N.D. 2017); *People v. Hoy*, 2017 IL App (1st) 142596, --- N.E.3d --- (2017); *People v. Lozano*, 16 Cal. App.5th 1286, 1289, 225 Cal. Rptr 104 (2017); *Newton v. State*, 83 N.E.3d 726, 737 (Ind. Ct. App. 2017); *State v. Scott*, 196 Wn. App. 961, 969, 385 P.3d 783 (2016), *review granted*, 188 Wn.2d 1001, 393 P.3d 362 (2017).

Irreparably lost.  *State v. Null*, 836 N.W.2d 41, 75 (Iowa 2013).

Irretrievable.  *State v. Bassett*, 198 Wn. App. 714, 730-31, 394 P.3d 430 (2017).

Irretrievable depravity.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 733, 193 L.Ed.2d 599 (2016); *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 2464 (2012); *Windom v. State*, 162 Idaho 417, 398 P.3d 150, 156 (2017).

Irretrievably corrupt.  *State v. Bassett*, 198 Wn. App. 714, 743, 394 P.3d 430 (2017).

No possibility of redemption.  *Garcia v. State*, 903 N.W.2d 503, 511 (N.D. 2017).

Permanently incorrigible.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 734, 193 L.Ed.2d 599 (2016); *Commonwealth v. Batts*, 163 A.3d 410, 416 (Pa. 2017).

Rare juvenile offender.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 733-34, 193 L. Ed. 2d 599 (2016); *State v. Scott*, 196 Wn. App. 961, 969, 385 P.3d 783, 786 (2016), *review granted*, 188 Wn.2d 1001, 393 P.3d 362 (2017); *Windom v. State*, 162 Idaho 417, 398 P.3d 150, 156 (2017).

Rarest of children.  *Steilman v. Michael*, 2017 WL 6348119, at *4 (Mont. Dec. 13, 2017).

Rarest of juvenile offenders.  *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016); *State v. Bassett*, 198 Wn. App. 714, 725, 394 P.3d 430 (2017); *Commonwealth v. Coia*, 2017 PA Super 250, 168 A.3d 219, 223-24 (Pa. Super. Ct. 2017).

Rarest of juvenile offenders whose crimes reflect permanent incorrigibility, irreparable corruption, and irretrievable depravity.  *Commonwealth v. Batts*, 163 A.3d 410, 416 (Pa. 2017).

Sufficient depravity.  *Graham v. Florida*, 560 U.S. 48, 77, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *State v. Bassett*, 198 Wn. App. 714, 723, 394 P.3d 430 (2017).

Unable to be rehabilitated.  *Commonwealth v. Coia*, 2017 PA Super 250, 168 A.3d 219, 222 (Pa. Super. Ct. 2017)

Uncommon situation.  *State v. Ramos*, 187 Wn.2d 420, 435, 443, 387 P.3d 650 (2017).

Virtually irredeemable.  *State v. Ronquillo*, 190 Wn. App. 765, 775, 361 P.3d 779 (2015).

Without any hope of rehabilitation.  *Commonwealth v. Batts*, 163 A.3d 410, 435 (Pa. 2017); *Newton v. State*, 83 N.E.3d 726, 739 (Ind. Ct. App. 2017).